GEORGE STEINBACH, as Special Adm'r of the Estate of Bryant Steinbach, a Deceased Minor, Plaintiff-Appellant, v. CSX TRANSPORTATION, INC., *et al.*, Defendants (The City of Peru, Defendant-Appellee).

Third District   No. 3—07—0844

Opinion filed July 16, 2009.

Michael W. Rathsack (argued), of Chicago, for appellant.

John E. Cassidy III (argued), of Cassidy & Mueller, of Peoria, Michael T. Reagan, of Herbolsheimer, Lannon, Henson, Duncan & Reagan, PC, of Ottawa, and Richard F. Nash, of Brasher Law Firm, L.C., of St. Louis, Missouri, for appellees.

JUSTICE WRIGHT delivered the opinion of the court:

Plaintiff, George Steinbach, filed a complaint at law against multiple defendants, including the City of Peru, Illinois, on April 11, 2002, as special administrator of the estate of his son, Bryant Steinbach. Following multiple amendments to the original complaint and other procedural matters that occurred over the course of several years, the trial court granted the City of Peru's motion for summary judgment. The court entered a written order on October 22, 2007, dismissing plaintiff's counts against the City of Peru with prejudice. Plaintiff filed a timely notice of appeal. Plaintiff and defendant City of Peru are the only parties to this appeal.

## PROCEDURAL FACTS

On April 11, 2002, the trial court appointed George Steinbach as special administrator on behalf of the estate of his son, Bryant Steinbach (decedent), who died on April 13, 2001. On that same day, plaintiff filed a 36-count complaint at law against multiple defendants seeking damages based on injuries resulting in the wrongful death of decedent.

Four counts of the complaint involved claims against the City of Peru (the City). In general terms, the four counts against the City alleged that defendant CSX Transportation, Inc. (CSX), owned and operated railroad tracks in the area known as upper Canal Parking Lot Bridge and that the City owned an adjacent gravel service road. According to the allegations contained in the complaint, the City placed a steel cable across the service road to prevent access to the road knowing that the height of the cable might be dangerous to individuals riding motorcycles/dirt bikes and other all-terrain vehicles on the service road. The complaint claimed that decedent suffered injuries while operating a dirt bike along the service road and ultimately died due to the City's failure to provide an adequate warning of the steel cable's presence.

Count V of the original complaint alleged a claim of negligence against the City based upon wrongful death and count VI alleged a

claim pursuant to the Survival Act (755 ILCS 5/27—6 *et seq.* (West 2002)). Counts VII and VIII alleged claims of wilful and wanton conduct by the City resulting in the death of decedent. Plaintiff sought damages in excess of $50,000 against the City on each count.

Thereafter, plaintiff filed multiple amended complaints at law in the years following the original filing. In response, the City filed multiple answers to the complaints, along with affirmative defenses and counterclaims. On June 10, 2004, the City filed a motion for declaration of rights seeking an order from the court setting forth the rights of the parties pursuant to the easement grant entered into between Hawkeye Land Company, CSX and the City. On July 1, 2004, plaintiff filed a motion to dismiss the City's and Hawkeye Land Company's claims for contribution and amended affirmative defenses against decedent's parents.

On July 20, 2004, the trial court entered an order setting a hearing on plaintiff's motion to dismiss the City's and Hawkeye Land Company's claims for contribution and amended affirmative defenses against decedent's parents on October 21, 2004. On October 21, 2004, the trial court granted plaintiff's motion to voluntarily dismiss all negligence counts against the City and granted plaintiff leave to file a fifth amended complaint. The trial court declared all other pending motions to be moot until plaintiff filed a fifth amended complaint. Although not specified by the court, presumably this order included the City's motion for declaration of rights filed on June 10, 2004.

On November 19, 2004, plaintiff filed a fifth amended complaint at law. Count III of the complaint alleged wrongful death arising out of the City's wilful and wanton conduct consisting of the construction of a steel cable stretched across the service road at the height of a motorcyclist/dirt bike rider's neck. Count IV of the complaint included a claim against the City based on wilful and wanton conduct pursuant to the Survival Act.

On March 4, 2005, plaintiff filed a motion to strike and/or motion to dismiss the City's affirmative defenses. Plaintiff alleged that the City did not have immunity from liability pursuant to section 11—1427(g) of the Illinois Vehicle Code (625 ILCS 5/11—1427(g) (West 2002)) because the City wilfully or maliciously failed to warn of a dangerous condition; the City wilfully and wantonly erected the steel cable across the service road; contributory fault did not apply to the allegations made; and the City failed to establish the protection of statutory immunity because erecting the steel cable did not qualify as a policy decision, design plan, inspection or traffic control device.

On June 2, 2006, the City filed a motion for summary judgment with a supporting memorandum of law. In the motion, the City alleged

that decedent died while operating an off-road motorcycle on the City's easement. The City further alleged that decedent trespassed on the property, that decedent illegally operated the off-road motorcycle, that the City owed no duty of care to decedent and that sections 3—102(a), 3—104, and 3—201 of the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/3—102(a), 3—104, 3—201 (West 2006)) provided immunity to the City from liability.[1]

In the memorandum of law filed by the City, the City relied on the deposition testimony of various individuals and claimed the depositions revealed certain undisputed facts of record. Those undisputed facts claimed by the City in the memorandum included the fact that the City purchased an easement from Hawkeye Land Company which allowed the City to erect an electrical wireline along CSX's railroad right-of-way and granted the City reasonable right to entry for the purpose of constructing, replacing, repairing, maintaining and operating said wireline. During the construction, vandalism to City property occurred, and as a result, the City erected the "fence in question to protect its equipment and materials by excluding trespassing along its easement."

The City also stated that the "fence was located on an old railroad track bed where CSX had removed the tracks that ran adjacent and parallel to the existing track." Then, the City stated that "[i]t is clear that the location of the accident was on CITY property." The City further stated that "the CITY'S easement ran along the former right-of-way of the Chicago, Rock Island & Pacific Railroad Company having a width of 100 feet." The City claimed that the City had the right to control the area in order to construct, maintain and protect its property and the City claimed that it was "undisputed that the poles and cable making up the fence were constructed from materials owned by the CITY."

The City stated that it was:
> "undisputed that BRYANT STEINBACH was neither an intended [n]or permitted user of the premises at the time of his accident. The CITY erected the fence for the specific purpose to exclude trespassers from its easement property."

The City explained that railroad personnel had not granted decedent permission to enter the land where the accident occurred. The City stated that the relationship of the parties and their relationship to the

---

[1]The City relied upon statutory provisions within its motion for summary judgment and memorandum in support of the motion which the trial court did not address or rely upon when granting the City's motion for summary judgment.

property vitiated any legal duty that might otherwise have been owed, and the City's status as a governmental unit gave rise to certain immunities that would operate to insulate the City from exposure even if a duty otherwise existed.

The City attached the following documents to its motion for summary judgment and memorandum in support of the motion: the easement grant from Hawkeye Land Company to the City, including exhibit A (maps of the railroad right-of-way) and exhibit B (legal description of the easement); deposition of Deborah Nichols and exhibits relating to the deposition consisting of the easement grant, maps, application for easement by the City, warranty deed to International Mining Corporation, quitclaim deed to Hawkeye Land Company, and the map setting forth the location of the poles and the wireline; deposition of Robert Woodshank; deposition of Patrick Benoir; and photographs of the scene.

On July 18, 2006, plaintiff filed an emergency motion to compel. In the motion, plaintiff's counsel alleged that the cable had been replaced or reinstalled just prior to the accident based upon the deposition testimony of decedent's friends and photographs. Plaintiff sought an order requiring the City to disclose such information. Plaintiff also sought to again depose CSX employee Leon Archer based upon an allegation that Archer had made subsequent admissions to counsel which contradicted his deposition testimony. Finally, plaintiff sought an order requiring CSX to comply with outstanding discovery, which included supplemental interrogatories and a supplemental request for the production of documents which included requests for the production of CSX's policies and procedures, inspection reports and information regarding CSX's standardized locks.

On January 3, 2007, the trial court scheduled a status conference on the pending motions for summary judgment and motions to dismiss for March 2, 2007. On February 16, 2007, plaintiff filed a response to the City's motion for summary judgment claiming that the City's installation of a shorter post on CSX's right of way violated the terms of the City's easement and defeated the City's assertion of immunity based on the contention that the area fell within the definition of public property. According to plaintiff's response, the post and cable did not constitute public property, thereby precluding the protection afforded by statutory immunity. Further, plaintiff's response stated that even if the posts and cable constituted public property, the decedent's death did not result from a condition on the property resulting from the City's failure to maintain the property, but resulted directly from a dangerous or wilful and wanton act by the City due to the construction of the cable.

On March 2, 2007, the trial court held a status conference. At that time, the trial court entered an order allowing the parties to continue additional discovery and setting a further status conference for May 3, 2007. On that date, the trial court granted plaintiff leave to file a sixth amended complaint at law.

On May 15, 2007, plaintiff filed the sixth amended complaint that contained six counts directed against the City. Count VII of the complaint was based in negligence and alleged a claim of wrongful death against the City based upon the City's negligent acts in erecting the posts and cable. Count VIII of the complaint alleged a claim based upon the Survival Act (755 ILCS 5/27—6 *et seq.* (West 2002)) due to the City's negligence. Count IX of the complaint alleged a claim arising out of the City's negligence based upon the Rights of Married Persons Act (hereinafter Family Expense Act) (750 ILCS 65/15 (West 2002)). Counts X, XI and XII of the complaint alleged claims based upon wrongful death, the Survival Act and the Family Expense Act resulting from the City's wilful and wanton actions.

On June 14, 2007, the trial court held a status conference. At that time, the trial court entered an order granting defendants, CSX and the City, leave to file further responsive pleadings in light of plaintiff's sixth amended complaint. The trial court scheduled a hearing on all pending motions for September 6, 2007.

On July 31, 2007, the City filed a motion to dismiss plaintiff's complaint and a reply to plaintiff's response to the City's motion for summary judgment. On August 7, 2007, plaintiff filed a surresponse to the City's reply. In the surresponse, plaintiff argued that the City's motion for summary judgment should be denied because the City exceeded the scope of its easement and the City created an artificial condition on the property, and thus the Act did not apply.

Plaintiff filed two exhibit binders with the court in response to the City's and CSX's motions for summary judgment. In the binders, plaintiff filed 36 tabbed exhibits which included numerous depositions discussed herein, along with discovery documents, case law, photographs, copies of the City's easement application submitted to CSX in 1993, the easement grant, a copy of a special warranty deed dated March 19, 1985, a quitclaim deed relating to the property rights of the parties, and an affidavit of Eugene Holland, offered by plaintiff as an expert witness.

## SUMMARY OF FACTS INCLUDED IN EXHIBITS ATTACHED TO MOTION FOR SUMMARY JUDGMENT, OBJECTIONS AND DISCOVERY DOCUMENTS

At the outset, we note the contents of the exhibits are addressed

below in chronological order dictated by the date the documents were produced or filed with the court.

## Police Reports

LaSalle police department reports, attached by plaintiff as tab H of plaintiff's exhibits in response to defendants' motions for summary judgment (plaintiff's exhibit binder), revealed that on April 13, 2001, emergency personnel responded to the railroad tracks and found decedent lying facedown. According to the reports, decedent wore motorcycle riding gear. The emergency personnel observed a bent steel cable around decedent's neck.

The report stated that witness Barb Owen observed decedent traveling along the railroad tracks at a high rate of speed. She observed the subject go down, and when the subject did not respond, she contacted emergency personnel.

Also according to the reports, the accident occurred between two posts, supporting a steel cable strung between the posts. Officers observed a yellow plastic sleeve surrounding the cable. Officers also observed a cable attached to one of the posts with a steel ring and padlock. One end of the cable remained attached to one of the posts. Emergency medical personnel removed decedent from the scene, but decedent later perished from his injuries.

## City's Answers to Interrogatories and Requests to Admit Facts

Initially, in answers to interrogatories filed with the court and included as tab Z of plaintiff's exhibit binder, the City stated that an easement relating to the property existed between the City and Hawkeye Land Company. The City indicated that it did not erect the cable in question or direct that the cable be erected. According to the City, railroad personnel authorized and directed the installation. The City acknowledged that it possessed a key to one of the padlocks attached to the cable so that the City could access city electrical lines.

Thereafter, in response to a request to admit facts, the City admitted that it participated in and approved of the installation of the steel cable where decedent suffered injuries and ultimately died, and the City knew of the cable's existence on the date in question.

## Deposition of George Steinbach

The March 16, 2004, deposition of George Steinbach, decedent's father, was attached as exhibit G to CSX's motion for summary judgment as to counts I and II of plaintiff's fifth amended complaint at law filed on December 21, 2005. During the deposition, Steinbach explained that his son, Bryant, died at the age of 14 years, and his death occurred shortly after the accident. Steinbach said that he knew

Bryant rode his motorcycle in the area of the service road on 10 prior occasions during the eight or nine months before the date of the accident. According to Steinbach, he was aware that other persons used the area for similar recreational activities, and he did not believe that his son had trespassed on the property. He indicated that he would not have allowed his son to ride on someone else's property. Steinbach believed that his son could ride in the area because of the open path, and no signs were posted to prohibit trespassing.

Steinbach stated during the deposition that he did not personally observe the cable in question at any time prior to the incident and admitted he had not been on the service road during the previous year. However, approximately one week after the accident, he learned of another individual being injured on the path prior to his son's accident. According to the information he received, another boy hit the cable while riding a motorbike approximately two years earlier when the cable was strung much lower at the time. That boy only suffered a broken arm. Steinbach testified that he did not learn of any other details surrounding that previous accident.

### Deposition of Robert Uranich

Plaintiff's October 6, 2005, deposition of Robert Uranich was attached as exhibit F to CSX's motion for summary judgment as to plaintiff's fifth amended complaint at law. According to the deposition filed with the court, Uranich, a member of the LaSalle police department at the time, responded to the accident on April 13, 2001. He described the one post on the right as a telephone pole, and he described the post on the left as being shorter, having a height only one-quarter the size of the telephone pole. Uranich observed a pink electrical wire on the ground next to the steel cable. Further, Uranich observed that the yellow sleeve did not stretch the entire length of the cable, but covered approximately three-fourths of the length. Based upon his observations, he concluded that the cable had been strung between the two posts at the time of the accident. Uranich also saw blood transfer and tissue on the cable. According to Uranich, photographs of the scene indicated that the bend in the cable occurred very close to the end of the yellow sleeve.

Uranich indicated that he believed CSX, the railroad company, owned the property. Uranich testified during the deposition that he believed that he had observed individuals on the service road prior to the accident, and he testified that he and other members of the department used the service road when responding to calls received by the department. He explained that the road and the area had been known for activities including motor vehicle, all-terrain vehicles and

motorcycle traffic, and he further indicated that he did not have any knowledge of the railroad company prosecuting any individuals for trespass in the area prior to the accident. Uranich had not personally stopped anyone in the area or issued tickets to those individuals for trespass. He had not observed anyone from the City in the area prior to the accident. Uranich could not recall if he observed any warning signs regarding the cable. He indicated that standing approximately 10 yards away, he could see the yellow covering on the cable.

## Coroner's Inquest

At a previous coroner's inquest, which plaintiff included as tab I of plaintiff's exhibit binder, and which Uranich acknowledged during the deposition, Uranich testified that the ring and padlock on the one end appeared undamaged. The padlock remained locked and attached on the day of the accident. At the inquest, he also indicated that he found a pink electrical wire, and it appeared that the cable had been strung across the road and held in place by bending the wire around the ring as opposed to locking it with a padlock. Uranich explained that when he arrived at the location, he observed the decedent lying on the ground. He observed a v-shaped bend in the steel cable located at decedent's neck.

## Deposition of Joseph Prazen

Plaintiff's November 6, 2003, deposition of Joseph Prazen was attached as tab Q of plaintiff's exhibit binder. Prazen testified that he worked as president of Electrical Consultants located in Peru, Illinois. The City had been a client of Electrical Consultants for approximately five years. Prazen previously served as superintendent of the City electrical department, but he could not recall which position he held at the time of the accident on April 13, 2001. He acknowledged his familiarity with the City's right-of-way along the railroad tracks that was used by the City to maintain and build power lines. He believed that CSX granted the easement to the City. His responsibilities as superintendent of the City electrical department included the day-to-day maintenance of the easement, along with other members of the City's electrical department. Prazen and the other men "drove the lines" to determine if any repairs needed to be made and issued work orders accordingly.

Prazen indicated that six acts of vandalism occurred prior to the installation of the cable but could not recall the exact dates of those events. He explained that guide wires were knocked down, evidence of camp fires existed, and discarded garbage accumulated at those locations. Prazen believed that the individuals responsible for those acts gained access with vehicles or trucks. At the time, he did not have knowledge of motorcycle traffic along the easement.

Prazen stated that either he or the linemen in the field made the decision to install the cable. He could not recall whether he directed the installation of the cable because of the vandalism or whether he noted the problem and left it to the linemen to install a barricade. Prazen also stated that the City had keys to the padlocks on the cable and that the padlock in question was a standard City of Peru electrical department padlock. Prazen believed that other entities, including contractors, CSX or the City of LaSalle, would use the right-of-way and had keys to the padlocks.

According to Prazen's deposition testimony, the City installed the cable using standard line equipment. He indicated that he considered the safety hazard to individuals on bicycles or motorcycles. However, he believed that the yellow plastic marking would bring attention to the cable. He could not explain why the City did not reattach the cable after the accident.

When asked whether the City notified Hawkeye Land Company that it intended to install the cable, Prazen stated:

"I don't know who Hawkeye Land Company is. Someone from the electric department talked to the section man, what we referred to, the electric department referred to as the section man, and whether he is Hawkeye's representative or not, I don't know."

He stated that he could not recall anyone other than City employees being involved in the installation or maintenance of the cable. Prazen stated that the posts and connected cable belonged to the City. According to his understanding, a section man would be considered an employee of the railroad company, and the railroad company granted the easement.

Prazen also understood the easement allowed the City to "go down in and do what we have to do, to maintain and build this power line." Prazen stated that his crew intermittently used the access road to check on the lines. He indicated that the crew would check the area at least twice a year. He could not recall whether the City considered removing the cable after the completion of the wireline construction and the City removed its equipment from the area.

## Deposition of Deborah Nichols

The June 24, 2004, deposition of Deborah Nichols was attached as tab L of plaintiff's exhibit binder. The City also attached the deposition to its motion for summary judgment and memorandum in support of the motion. Deborah Nichols, the real estate manager for Hawkeye Land Company, explained in her deposition that the property originally belonged to the Chicago-Rock Island Railroad but after that company went into bankruptcy, "Chicago Pacific Corporation" became the property owner and later deeded the mineral rights to the land to

International Mining Corporation, but reserved easement rights and a 100-foot right-of-way. Later, Hawkeye Land Company purchased the interest to convey easements to the area in question, from the Chicago Pacific Corporation. Subsequently, Hawkeye Land Company conveyed an easement to the City of Peru for the purpose of erecting power lines along with poles and attachments. She further explained that Hawkeye Land Company did not purchase the property from Chicago Pacific Corporation.

She explained that CSX operated the railroad tracks on the property. She believed that CSX had to approve the easement to the City because of its status as the operating railroad. Nichols explained that there were no specific measurements relating to the railroad right-of-way. Further, in this case, the easement to the City did not designate the boundaries of the easement to the grantee. She explained that the company's current practice is to typically grant a 10-foot-wide easement.

When shown a photograph of the scene of the accident and questioned about the shorter pole, she indicated the following:

> "To my knowledge they got an easement for a wire line. I don't believe their easement stated anything else, so I am not aware that was part of the easement."

She indicated that she did not have knowledge of the poles or equipment needed or used for the City's installation of the electrical wireline. She only knew that the City had been granted an easement for the electrical wireline, and she did not believe that the smaller pole, depicted in the photograph of the scene of the accident, was part of the City's electrical wireline.

She further explained Hawkeye Land Company's procedures as follows:

> "FIEDLER: If you grant an easement to somebody, and in this particular case the City of Peru, for the erection of these power lines, if they're going to add something in addition to that, do they need your permission?
>
> NICHOLS: They need to follow the application procedure, which would be to make an application to the railroad company who in turn would forward it to us.
>
> FIEDLER: Okay. So if there's anything in addition to what was specifically granted to them in the easement, they would have to go through the application process again; is that correct?
>
> NICHOLS: Yes, that's correct."

To her knowledge, Hawkeye Land Company had not granted any additions or changes to the City's original easement. Upon further questioning regarding whether the post and cable constituted a fence,

she continued to indicate that an additional easement would be needed because the easement, which had been conveyed, related only to electrical wirelines.

Easement Grant

The easement grant was attached as tab K of plaintiff's exhibit binder. The City also attached a copy of the easement grant to its motion for summary judgment and memorandum in support of the motion. According to the easement grant filed with the Court, the document, dated April 28, 1993, listed Hawkeye Land Company as grantor and the City of Peru as grantee. However, in the introductory paragraph, the easement grant also stated that references to "Grantor" herein shall be modified as "appropriate to confer rights of 'Grantor' on CSX Transportation Company and International Mining Company." According to the grant, Hawkeye Land Company granted the City an easement "for a 34.5KVA wireline, and no other purpose." The easement further provided in part the following:

"Grantee's use of the property herein described is made subject to the following terms and conditions which are deemed covenants and shall run with the land:

1. The Grantee shall construct, replace, repair, maintain and operate said wireline in accordance with the standards and guidelines set forth in the National Electrical Safety Code as promulgated by the American National Institute, Inc. or its successor organization, provided that such standards and guidelines meet the minimum standards required by law.

2. Grantor shall permit Grantee reasonable right of entry for the purpose of constructing, replacing, repairing, maintaining and operating said 34.5 KVA wireline.

3. Grantee shall pay the entire cost of constructing, repairing, maintaining and operating said 34.5 KVA wireline. All of said work shall be done in a good and workmanlike manner and in accordance with the plans, specifications and profiles, specifically including date of commencement of work to be prepared by Grantee and submitted in writing for approval to Grantor; and, except in emergencies, until such approval is first had, and such approval shall not be unreasonably withheld, said work upon Grantor's premises shall not be begun by Grantee. Grantor reserves the right to have a representative present, but in no way waives any rights under this easement agreement by failing to have said representative present.

4. Grantor shall have the right to retain existing tracks and other improvements at the location of this easement and shall also have the right at any and all times in the future to construct,

maintain and operate over said easement such additional track, tracks and other improvements as he may from time to time elect ***. The Grantor reserves the right to grant future easements under, over, across or parallel with the above-described premises as long as such grant does not interfere with Grantee's use contemplated herein."

## Deposition of Douglas Severson

The October 11, 2005, deposition of Douglas Severson was attached by plaintiff as tab V of plaintiff's exhibit binder. Douglas Severson, train master with CSX since 1999 or 2000, testified during his deposition that following the accident, Severson went to the location and performed an inspection. During the inspection, he observed that the cable had a lock attached to the smaller pole and that he did not recognize the lock to be a standard railroad lock. He also observed that the cable had a yellow sheath and that the cable was attached on one end to a high line pole and the other end was attached to a smaller pole. After completing the inspection, he reported the information regarding the lock to Ken Mettler of CSX.

Severson did not have any personal information regarding the installation or maintenance of the cable. However, he knew of the existence of the cable prior to the accident, and he recalled seeing the cable between more than 1 and less than 10 times. Severson stated that sometimes the cable stretched across the road, and on other occasions, he observed the cable on the ground. Severson also stated that on one occasion, he observed a dirt bike on the gravel road. He stopped the rider and advised the person of the dangers of riding near the tracks.

## Deposition of Leon Archer

Plaintiff's October 11, 2005, deposition of Leon Archer was attached as tab GG of plaintiff's exhibit binder and Archer's report was attached as tab J of plaintiff's exhibit binder. According to his deposition, Leon Archer was employed as a signal inspector with CSX. Prior to serving as signal inspector, Archer worked as a lead maintainer, which involved the maintenance and repair of the railroad crossings and equipment. As part of his railroad crossing inspections, he inspected the area of the accident on foot. However, he could not determine how many times that he walked the area over the course of the four or five years prior to the date of the accident, and he did not know of any documentation regarding that fact.

After the accident, he prepared a report. He relied in part on a newspaper article about the accident. In his report, he indicated that CSX used the service road to access the railroad tracks. Further, he

also indicated that the City used the road to maintain its electrical wires and fiber optic cables. He believed that the Department of Conservation also used the road. He stated that the City strung the cable across the service road because of vandalism. Archer noted that a yellow sleeve covered the cable and that the cable had been in place for approximately five or six years.

During the deposition, Archer stated that he could not say whether he actually saw any City employees on the service road for maintenance purposes. Further, he did not have present knowledge that the City erected the cable. He believed that the City installed the barrier. He surmised the railroad would not have installed the cable because the railroad workers needed to readily access the tracks for maintenance. Prior to the accident, he saw the cable both stretched across the road and on the ground. Archer explained that he did not observe anyone else connect or disconnect the cable. Archer could not recall whether or not he connected or disconnected the cable, but he did recall seeing more than one lock on the cable. However, he did not know who owned the locks. He stated that no one contacted him about the erection of the cable and posts on the service road.

Archer also stated that he did not have any information regarding the property rights in the area. However, he believed that the railroad right-of-way included only the area directly underneath the tracks. He did not have any idea who owned the service road.

### Deposition of William Evans

Plaintiff's December 16, 2005, deposition of William Evans was attached as exhibit 9 to LaSalle County's memorandum in support of its motion for summary judgment filed on April 28, 2006. Paragraph nine of the City's motion for summary judgment incorporated and adopted the arguments and exhibits made by LaSalle County. Evans, a deputy with the LaSalle County sheriff's department for the past 18 years, explained that he had been a certified accident reconstructionist with the State of Illinois since 1995.

Evans stated that he went to the scene of the accident on April 13, 2001, for the purpose of gathering information to complete an accident reconstruction report. Subsequently, he prepared a report which consisted of police incident reports, a field sketch diagram, photographs and computer printout calculations. Based upon his observations and information received, he concluded that decedent came in contact with the cable but could not conclusively determine what portion of the cable first came in contact with decedent's person. Evans observed blood and tissue at the bend in the cable. He concluded that decedent's body came to rest on the ground at the location where the chest protec-

tor and blood spot were observed. Evans stated that he observed fresh skid marks and furrow marks in the gravel consistent with the location of the motorcycle.

He observed one end of the cable attached to one of the poles with an I-bolt and lock, and he believed that the other end of the cable had been fastened with a wire. Evans concluded that when stretched across the road between the two poles, the cable's height measured 3 feet and 11 inches from the ground. The handlebars of decedent's motorcycle measured 3 feet and 9 inches from the ground. Evans further estimated that decedent traveled at a speed between 42 and 53 miles per hour. However, the estimate of speed could be higher because he could not factor in the effect of hitting the cable.

## Deposition of Justin Schmitt

Plaintiff's January 31, 2006, deposition of Justin Schmitt was attached by plaintiff as tab A to plaintiff's exhibit binder. Schmitt advised that on April 13, 2001, he, decedent and Derek Piecha planned to ride bikes along the river. He and Piecha were delayed by mechanical problems, and after arriving late, they did not see their friend and began looking for him. Shortly thereafter, they were stopped by police, who advised them of an accident. Ultimately, he learned that decedent had been involved in the accident.

Schmitt explained his familiarity with the location as he frequently rode his four-wheeler in the area. He described a park and picnic area near the location. Further, at the time, an open parking lot and a bicycle trail existed nearby. Schmitt further explained that he rode the specific area approximately four times during the preceding year. During those times, he did not observe a cable stretched across the service road. He indicated that he was positive of that fact. Schmitt believed that someone had put the cable up since the last time he rode in the area.

He said that while riding along the tracks, the police did not stop him. However, approximately two weeks before the incident, the police stopped him on the way to the service road. The police told him to push the four-wheeler down to the tracks. Further, no one else ever stopped him or advised him not to ride on the service road. He stated that individuals riding trucks on the railroad tracks regularly saw him and waved at him.

## Deposition of Derek Piecha

Plaintiff's January 31, 2006, deposition of Derek Piecha was attached by plaintiff as tab B of plaintiff's exhibit binder. Piecha stated that he knew decedent because they were neighbors. Prior to the accident, he rode off-road bikes or four-wheelers together with decedent.

On April 13, 2001, he and Schmitt rode on a path near the train tracks to meet decedent, who would have been coming in their direction. They had planned to ride along the river that day. At that time, he saw the ambulance and numerous police officers. The police told them that an accident had occurred and to turn around and go home. Then, he saw the dirt bike on the ground and knew that decedent had been injured.

Piecha stated that he did not remember seeing the cable or the yellow sleeve at any time before this incident. He stated that he used to ride his off-road motorcycle through the same area prior to April 13, 2001, approximately 25 to 50 times per month. Piecha stated that possibly the cable and sleeve could have been present but only attached to one pole. He did recall seeing other people using the gravel path and driving on the gravel path. He explained that a recreational area is located nearby. Piecha also saw people driving on the tracks on one or two occasions, but the individuals did not say anything or stop him. Further, he had not previously observed any "no trespassing" or "private property" signs.

### Deposition of Robert Woodshank

Plaintiff's April 20, 2006, deposition of Robert Woodshank was attached by plaintiff as tab S to plaintiff's exhibit binder. The City filed a copy of the deposition as an exhibit to its motion for summary judgment and memorandum in support of the motion. Woodshank testified that prior to retirement in 2002, he worked with the City of Peru's electrical department. He acknowledged that prior to the deposition, he had been shown pictures of the scene. He stated that he participated in the installation of the poles and cable in question. Woodshank said that Prazen worked as either superintendent or a consultant at the time the poles and cable were installed. Woodshank explained that at the time of the installation, Prazen approached him and advised him to "get two hefty stub posts and put them in the ground." Prazen directed him to place a guide wire with a yellow guard and lock. Woodshank followed Prazen's directions and erected the cable and posts.

Woodshank could not recall Prazen completing a written work order for the construction. Woodshank said that Prazen wanted the poles installed to keep vandals off the pole line. At the time he installed the cable, the department had already started the installation of the wireline project. He did not have any personal knowledge of the vandalism, but he did learn of a pole set ablaze and a truck pushed into the canal. Woodshank stated that it took approximately 1 1/2 years to install the electrical wireline along the railroad tracks.

Woodshank explained that he did not consult with CSX prior to the installation of the wirelines, poles or cable. Further, he did not

have any knowledge whether Prazen spoke to anyone from the railroad. He described a section man as a person from the railroad that inspected the lines. Woodshank could not recall ever fixing or otherwise maintaining the cable after being installed. He also could not recall the cable ever being unlocked or taken down. Woodshank did not know whether a need existed for the cable after the City's wirelines had been installed, and he did not know whether the pink wire attached to the cable at the time of the accident belonged to the City. When asked if the pink wire was a "type that the city of Peru electrical department used," he stated "I don't know. It's common wire."

Woodshank estimated that five years passed between the completion of the electrical wireline installation and the accident on April 13, 2001. During that five-year time period, he did not have any idea what happened to the cable, other than he believed that the cable remained in place.

### Deposition of Patrick Benoir

Plaintiff's May 2, 2006, deposition of Patrick Benoir was attached by plaintiff as tab O to plaintiff's exhibit binder. The City attached the deposition as an exhibit to its motion for summary judgment and memorandum in support of the motion. Benoir stated that he served as roadmaster for CSX since 1994. As roadmaster, his responsibilities included the maintenance and construction of the roadbed/track within particular subdivisions of the area operated by CSX. He explained that pursuant to federal law, the railroad tracks must be inspected by a qualified employee once per week. He further explained that track inspectors must complete certain paperwork forms and that track inspection basically involves looking at the track structure. Benoir stated prior to the accident, he drove the gravel service road approximately five times. On those occasions, he observed the cable on the ground and simply drove over it between the two poles.

In his years with CSX, he stated that he did not use a cable to attempt to restrict access or barricade an area. He further stated that typically CSX would use boulders, an earthen barricade or a large illuminated sign to block or close areas. Benoir did not have any knowledge regarding the installation of the poles or the cable. Benoir also stated that he had not determined whether the lock on the cable belonged to CSX.

Benoir explained that when power lines or fiber optic lines are installed near the tracks, CSX issues a permit via a specific process, and CSX receives information regarding the placement of the lines. However, he indicated that he is not personally involved in that

process. Benoir could not state where CSX's property lines existed in relation to the area in question. However, in order to enter CSX's property, an individual or entity would have to have an easement or right-of-way.

## Deposition of Javier Frausto

Plaintiff's July 18, 2006, deposition of Javier Frausto was attached by plaintiff as tab W to plaintiff's exhibit binder. Javier Frausto, a backhoe operator with CSX, testified that he previously worked as a foreman and track inspector with CSX. He explained that a track inspector's duties include inspecting the entire mainline of the railroad. Further, the inspector completes paperwork regarding daily and monthly inspections. Frausto stated that he did not have any knowledge about the cable's installation. He stated that from sometime in 2000 until the date of the accident, he went to the area once per week, and he served as track inspector for CSX. Frausto explained that he observed employees from the City's electrical company using the service road, but he observed those employees very rarely. When he drove the gravel road, he never observed the cable stretched across the road. However, Frausto observed the cable and yellow sheath on the ground. He did not observe the pink wire and, consequently, could not offer any explanation regarding the origin of the pink wire.

## Deposition of Don Sparling

Plaintiff's August 24, 2006, deposition of Don Sparling was attached by plaintiff as tab E to plaintiff's exhibit binder. Sparling stated that he had worked for CSX for the past 29 years and currently served as bridge foreman. As part of his employment, he needed to access a bridge near the train tracks. To do so, he would use a company pickup truck and travel the gravel service road.

Prior to 2001, he estimated that he traveled the area from 50 to 60 times. During that time, he recalled only one occasion where the cable stretched across the road between the two poles. Since the cable had been locked to the pole, he returned to his truck and left the area. He explained that because the one post was located so close to the tracks, he could not drive around it. He did recall the yellow sleeve on the cable, but the cable was down on the ground nearer to one side. When shown a picture of the accident site, Sparling stated that he did not recognize the pink wire and that he had never before seen the wire. He also explained that the picture depicted the cable attached to the shorter pole but typically, when he saw the cable, it was attached to the other pole.

Sparling also recalled seeing City workers on two occasions, and they appeared to be looking at the high wires. He stated that besides

the City workers and CSX employees, motorcycles, four-wheelers and other all-terrain vehicles consistently used the service road.

At the location of the accident, CSX originally had a second set of tracks located on the gravel service road. At some point, CSX removed the tracks. As part of his inspections of the track, he did not report the cable to anyone with CSX as a dangerous or unsafe condition. Further, he did not give any consideration to the fact that motorcycle or all-terrain vehicle riders traveled the road. When asked whether he believed the cable constituted a dangerous or unsafe condition for the motorcycle or all-terrain vehicle riders, counsel for CSX objected and instructed him to not answer the question.

## Deposition of James H. Reutner

Plaintiff's August 24, 2006, deposition of James H. Reutner was attached by plaintiff as tab P to plaintiff's exhibit binder. James H. Reutner, a foreman, flagman and track inspector with CSX, stated that when he served as track inspector, he observed the cable in question approximately once per week. He further stated that he saw the yellow sleeve on the cable. Every time he went to the location, he found the cable enclosed in a yellow sleeve lying on the ground on one side of the road near one of the poles. Reutner stated that he never saw the cable attached and stretched across the gravel road. Reutner did not recognize the pink wire at the location in question, and he did not recall ever seeing the pink wire during his employment with CSX.

Reutner stated that he traveled the service road and tracks looking for hazardous or dangerous conditions in order to prevent derailments or injuries to CSX employees or other individuals. He knew that all-terrain vehicle or motorcycle riders used the gravel road. Reutner stated that part of his job included telling "them it's not safe to be riding there." He further explained that riding along the gravel road causes damage by "[t]earing the ballast away from the ties here and then making it where the track can be moved. If there was no gravel on the end of these ties, this rail can—when it gets hot the rail can jump out on them."

## Deposition of Kim Rice Bongiovanni

Plaintiff's October 25, 2006, deposition of Kim Rice Bongiovanni was attached by plaintiff as tab EE of plaintiff's exhibit binder. Bongiovanni, in-house counsel for CSX, indicated that she reviewed surveys, a "val map," photographs, a lease and the depositions of individuals from the City, the City of LaSalle and Hawkeye Land Company, being Nichols, Prazen and Pamela Broviak, in preparation for her deposition. She stated that she had not made any determination as to where the property lines of CSX begin or end. Bongiovanni

stated when she looked at the "val map," the survey and the lease, "none of this is entirely clear." She further explained that CSX is successor to the original lessee and therefore received "whatever interest the fee owner, the landlord, at the time had. In the railroad world, since the interests have been around for hundreds of years, there have been a lot of acquisitions and dispositions." She also stated:

> "[O]ur only concern is that we have a contiguous track on which we can do our core business. That's the objective, and that's what we look at. We do not go to the expense to try to figure out for each of the 23,000 miles that we have—that we operate on what our underlying interest is."

Bongiovanni stated that it was unclear where the track lines stop pursuant to the lease. CSX acquired whatever interest the landlord, the trustee for Chicago-Rock Island and Pacific Railroad Company, had in the area in 1981 when the parties executed the lease. She did not believe that CSX was a party to the easement granted between Hawkeye Land Company and the City, and she disagreed with Nichols' assessment of that issue. According to Bongiovanni, CSX did not receive an easement or ownership interest as successor. When specifically asked what CSX inherited, she stated that CSX got a portion of the right-of-way, excluding the southerly track, and that is all CSX knew at the time. She stated that CSX knew that it could operate the railroad and the trains. Once this litigation occurred, CSX conducted a more thorough check through a survey. However, she could not tell how many feet south of the railroad tracks that included.

### Deposition of Donald L. Baker, Jr.

Plaintiff's September 27, 2006, deposition of Donald L. Baker, Jr., was attached by plaintiff as tab N to plaintiff's exhibit binder. Donald L. Baker, Jr., described his current status as a journeyman lineman with the City's electrical department for the past 10 years. He was employed with the department for a total of 17 years. He explained his familiarity with the installation of the power lines along the railroad tracks. He also explained that the linemen were responsible for the maintenance of the wirelines subsequent to the original installation. Baker stated that the City did not have a protocol or policy regarding inspecting the lines. The linemen would respond when a problem occurred.

When he checked the lines, he used the gravel road. Further, he helped install the lines, and therefore, he was present in the area every day for 1½ years. Thereafter, he received instructions from Joseph Prazen to install the shorter pole and cable in question. He received the instructions via his foreman, Bob Woodshank.

According to Baker, Woodshank advised that they needed to put up a gate. He could not recall any other conversations or instructions regarding the installation from either Woodshank or any other individual. Further, Baker stated that he did not know why Prazen or the City needed a gate and that Woodshank did not know either. Baker also stated that he did not install any other similar gate for the City. He could not recall whether any representative of CSX was present when he and Woodshank installed the post and cable. Baker also could not recall whether he made any conscious decision as to the yellow guard covering the entire length of the cable. Further, he stated that he and Woodshank did not install any type of warning signs to alert individuals of the cable's presence, and they were not instructed to do so. He believed that initially he wrapped one or both of the poles in yellow caution tape but acknowledged that the tape does not last long.

When asked if he ever gave any thought or consciously considered that "the hydro line is completed, we need to remove the smaller pole and the guy wire," he stated "Sure, I did." He went on to state, "I just didn't think it needed to be there." Initially, he stated that the cable and post created a hazard for the employees when they proceeded to the area because of a problem with the electrical wires. Thereafter, Baker corrected himself and stated that it only created difficulty for the employees. Baker further stated that neither he nor Woodshank believed that the post and cable should have been put in place. However, he thought the cable and post were safe because the "guy guards" were very visible.

Baker explained that he did consider whether the cable could cause injury to all-terrain vehicle or motorcycle riders. He said that his main concern focused on snowmobilers because of the height of the cable. However, the guard is very visible in the snow. He and Woodshank discussed their concerns between themselves, but he did not voice his opinion to anyone else.

He later learned that the City erected the gate to keep people away from the City's wirelines. Specifically, he believed that the City wanted to stop hunters from causing problems. During the installation of the "hydro line," he learned of one incident of vandalism involving one of the City's trucks.

Baker stated that he had knowledge that all-terrain vehicles and motorcycles used the service road. However, he did not personally see any such vehicles when working on the power lines. When the City installed the hydro line, he did observe all-terrain vehicles on the road approximately four or five times. Baker did not observe anyone attempt to stop the riders. Further, he did not observe the riders damaging the City's property. Baker stated that representatives from CSX

were present at the start of the hydro line installation. After the first month or so, the City eliminated CSX's representatives because of the cost.

## Easement Application

At tab G in plaintiff's exhibit binder, plaintiff included copies of the City's easement application submitted to CSX in 1993. Joseph Prazen of the City electrical department completed the application. In a letter dated April 27, 1993, a representative from Hawkeye Land Company sent the City a copy of the power line easement and advised the City that it must contact CSX at least 72 hours prior to construction.

## Special Warranty Deed

Within tab L of plaintiff's exhibit binder and attached to Nichols' deposition, plaintiff also included a copy of a special warranty deed dated March 19, 1985. The deed provided that Chicago Pacific Corporation and the Peoria and Bureau Valley Railroad conveyed to the International Mining Corporation, forever, "a strip of land of varying widths constituting a continuous line of railroad including, but not limited to, all rights-of-way, ancillary rail facilities, trackage, industrial sidings, buildings, bridges, trestles, culverts, equipment, and all appurtenances of and to the foregoing, of whatsoever kind and description; and all coal, oil, gas and minerals and mineral rights of whatsoever nature now known to exist or hereafter discovered in or on the Property."

The deed further provided that the grantor reserved the right to grant temporary or perpetual nonexclusive easement or easements over, under, upon, along or across the property for the construction of transportation or transmission systems for all and every type of fluids, gases or energy. Within tab L and also attached to Nichols' deposition, plaintiff included a copy of the quitclaim deed executed between Chicago Pacific Corporation and Hawkeye Land Company.

## Affidavit of Eugene Holland

The February 16, 2007, affidavit of Eugene Holland was included by plaintiff as tab U of plaintiff's exhibit binder. Holland stated that he served as a licensed structural and professional engineer in the State of Illinois and 15 other states with knowledge and experience in the area of barrier and fence safety. Based upon his review of relevant documents and the circumstances of the incident, he gave opinions with a reasonable degree of professional engineering and security certainty.

First, Holland opined that the cable and posts, which caused decedent's death, were not designed or erected in accordance to any

recognized standard. Second, Holland opined the cable's height appeared to be slightly above the height of the handlebars of an off-road motorcycle. Third, Holland opined the City and CSX did not utilize any protocol for the reattachment of the cable resulting in the cable being commonly located on the ground. Further, the guy guard did not adequately alert cyclists of the wire's presence. Fourth, Holland opined that industry standards, statutes, codes, safety programs and recommended practices apply to the City. The City failed to give consideration to the location and height of the cable, the proper and accepted methods of fencing or barricading, the safety and welfare of riders or the lack of functionality of the purpose of the cable. Fifth, Holland opined that the installation of the cable created an unsafe and hazardous condition that did not prevent vandalism or use of the right-of-way. Sixth, Holland opined the City had notice of the condition and allowed it to exist without taking any measures to remove it or properly warn or guard against the danger. Seventh, Holland opined the City deviated from the applicable statutes, codes and generally accepted safety practices and those deviations resulted in decedent's death. Eighth, Holland opined the City acted with conscious disregard or utter indifference to the safety of others.

## Legal Description of the Easement

A legal description of the easement was attached by the City to its motion for summary judgment and memorandum in support of the motion. The document described the easement in part as a "nonexclusive easement along the former right-of-way of the Chicago, Rock Island & Pacific Railroad Company having a width of 100 feet."

## SUMMARY OF THE HEARING

On September 6, 2007, the trial court conducted a hearing on the City's motion for summary judgment and CSX's motion to dismiss. The City argued several points. First, the City argued that section 11—1427(g) of the Illinois Vehicle Code (625 ILCS 5/11—1427(g) (West 2002)) provided that an owner of property did not owe any duty to an off-road motorcycle rider unless the owner wilfully or wantonly failed to guard or warn the rider of a dangerous condition. Therefore, the City claimed that all counts of the complaint that did not allege wilful or wanton conduct should be dismissed.

The City then argued the issue of tort immunity. The City argued that the City only owed a duty to permitted and intended users of the property and did not owe a duty to the decedent who was a trespasser at the time of the accident. Then, the City argued that the City had an easement which authorized the construction of the cable and the City owned the property.

Further, the City claimed that tort immunity shielded the City from liability for wilful and wanton acts because the erection of the cable and the reattachment of the cable constituted an activity on the part of the City. City's counsel argued that section 3—109 of the Act (745 ILCS 10/3—109 (West 2002)) did not apply. Counsel stated that the City did not have a duty of care to trespassers.

Plaintiff's counsel argued that section 3—102 of the Act (745 ILCS 10/3—102 (West 2002)) related only to a City's duty to maintain. In this case, counsel further argued that the City created a dangerous condition. Counsel asserted the Act did not shield the City from liability and, therefore, liability based upon standard negligence rules applied. Counsel further explained that plaintiff still maintained that a viable issue existed regarding ownership of the property and that this argument served as an alternative if the court found the property in question to be City property. Further, counsel argued that the property did not constitute City property because the City exceeded the scope of its easement in entering the property of another and erecting the cable and posts. Plaintiff's counsel noted that originally the City argued that it had a limited easement and that the City did not own or control the posts and cable. Now, the City claimed ownership of the fence in order to invoke immunity. Therefore, counsel urged the trial court to find that the City was judicially estopped from claiming ownership based upon its original assertions.

The trial court stated that the first question involved the issue of whether the property constituted City property. The court then stated the following:

"We have the undisputed facts—and again, for the purpose of this motion, I think we have to take the facts in the light most favorable to the plaintiff. But I don't think there is a lot of dispute as to what the facts are. The City was given an easement to build a power line. And the easement is in their original memorandum allows them to build this power line.

And as counsel has pointed out—as the City pointed out, the easement also allowed them to maintain and guard and take care of the power line, make sure it was going to be protected. And the argument is made well, it's not their property because it's not strictly in conformance with the easement. Well, of course, the parties to the easement will agree that it was okay to do it. And I believe it does fall under the language of the easement."

The trial court concluded that the "fence" constituted City property. The trial court stated that the cable belonged to the City, and the City put the cable in place. The trial court further stated:

"They let other people use it. They let other people take it up and down who were authorized to be in the area. But it was the City's property under any definition."

The trial court then said the following:

"But even if you were to question the easement, they were doing it—and I don't think they had a signed right to do it—and it was their fence. So it is, I find, the City's property."

The trial court next addressed the question of activity or condition. Plaintiff argued that the erection of the cable constituted an activity. The court stated that activity required action, and this constituted a condition. The fence sits on the property and created the condition that decedent encountered. The trial court concluded his discussion by saying, "And I think that's the only logical way to read the facts of this case even in the light most favorable to the plaintiff. It is a condition, not an activity."

Having concluded that the fence was City property and constituted a condition of the property, the trial court turned to the issue of immunity. The court stated that section 3—102 created a duty for the City to exercise ordinary care to maintain its property in a reasonably safe condition for the persons who the City intended and permitted to use the property. The trial court then said:

"There cannot be any dispute in this particular case that Bryant Steinbach was not an intended or permitted user. He was a trespasser. He was driving a dirt bike down a railroad right-of-way where the City had an easement, where the City had put up this fence. He was not an intended or permitted user. This was not a dirt bike path. This was not some permitted use."

Accordingly, the trial court found that the City did not owe decedent any duty.

Further, the trial court found that section 3—109 of the Act did not supercede section 3—102 (745 ILCS 10/3—109, 3—102 (West 2002)). The trial court concluded that its ruling followed the mandates of *First Midwest Trust Co., N.A. v. Britton*, 322 Ill. App. 3d 922 (2001). Therefore, the trial court further concluded that the motion for summary judgment should be granted and that the counts of plaintiff's sixth amended complaint against the City should be dismissed.

In relation to CSX's motion to dismiss, the trial court noted that in light of section 11—1427 of the Vehicle Code (625 ILCS 5/11—1427 (West 2002)), CSX could be held liable for wilful and wanton misconduct and failure to guard and warn. The trial court made the following findings:

"There is enough in here in the allegations that they willfully and wantonly knew about this dangerous situation and didn't warn

anybody and it was on their property and on their right-of-way. And of course, there is [*sic*] allegations that they knew there were bikers coming down the road and everything else. The railroad has got a different standard obviously than the City."

Accordingly, the trial court granted the motion to dismiss as to any counts based upon negligence but denied the motion as to plaintiff's counts relating to CSX's failure to guard or warn.

On October 22, 2007, the trial court entered a written order in which the trial court made the following findings:

"1. The facts establish, when considered in a light most favorable to the Plaintiff, that Section 3—102(a) of Illinois' Governmental Tort Immunity Act ('Immunity Act') applies herein for the following reasons:

a. The fence and location of the Bryant Steinbach accident was CITY 'property' as that term is used under Article III of the Immunity Act. The CITY owned an easement over the location of the accident and owned the subject fence that was permissibly built under the easement because:

i. The fence was constructed with material owned by the CITY OF PERU;

ii. The fence was erected entirely within the width of the easement granted to the CITY;

iii. The fence was erected to secure the CITY'S 34.5 KVA wire line which was permitted under paragraph 8 of the Easement Grant; and

Even if there was no ownership, the fence and location of the Bryant Steinbach accident was CITY 'property' because the CITY exercised dominion and control over both the fence and the location of the accident. See *Lerma v. Rockford Blacktop Construction Company*, 247 Ill. App. 3d 567 (1993).

b. Regarding the allegations against the CITY, the accident involved a condition of the CITY'S property and not an activity by the CITY.

c. BRYANT STEINBACH was a trespasser at the time of his accident."

The trial court further found that the "CITY owed no duty to the decedent, BRYANT STEINBACH, because he was neither an intended nor permitted user of the City's property at the time of his accident." The trial court granted the City's motion for summary judgment pursuant to section 3—102(a) of the Act. The court also found that section 3—109 of the Act did not take precedence over section 3—102(a) of the Act. The trial court entered judgment on behalf of the City and against plaintiff. The trial court found its ruling appealable pursuant to Supreme Court Rule 304(a) (210 Ill. 2d R. 304(a)). Plaintiff filed a timely notice of appeal on November 20, 2007.

## ANALYSIS

On appeal, plaintiff claims the trial court erroneously granted the City's motion for summary judgment based on the court's determination that decedent constituted a trespasser on City property, that the City was immune from liability, and then dismissed plaintiff's sixth amended complaint against the City. The City claims the trial court properly recognized the City's statutory immunity pursuant to section 3—102 of the Act (745 ILCS 10/3—102 (West 2006)) and granted summary judgment.

The statutory provisions regarding summary judgment are set forth at section 2—1005 of the Illinois Code of Civil Procedure. 735 ILCS 5/2—1005 (West 2006). Subsection 2—1005(b) provides that "[a] defendant may, at any time, move with or without supporting affidavits for a summary judgment in his or her favor as to all or any part of the relief sought against him or her." 735 ILCS 5/2—1005(b) (West 2006). Subsection 2—1005(c) provides, in part:

> "The opposite party may prior to or at the time of the hearing on the motion file counteraffidavits. The judgment sought shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 2006).

The movant's right to summary judgment must be "clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).

In reviewing an order granting summary judgment, all of the facts must be viewed in a light most favorable to the nonmoving party. *Ramirez v. Smart Corp.*, 371 Ill. App. 3d 797, 801 (2007), citing *Eyrich v. Johnson*, 279 Ill. App. 3d 1067 (1996). Further, the "depositions, admissions, exhibits and affidavits are to be construed strictly against the movant." *Bluestar Energy Services, Inc. v. Illinois Commerce Comm'n*, 374 Ill. App. 3d 990, 993 (2007), citing *Delaney Electric Co. v. Schiessle*, 235 Ill. App. 3d 258, 263 (1992).

If an examination of the record reveals that "it can be fairly stated that a triable issue of fact exists, the motion should be denied." *Ramirez v. Smart Corp.*, 371 Ill. App. 3d at 801, citing *Bellmer v. Charter Security Life Insurance Co.*, 140 Ill. App. 3d 752 (1986). Summary judgment must be denied when "divergent inferences" may be drawn by a reasonable person from undisputed facts. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d at 102.

When a trial court grants summary judgment, we review the court's findings *de novo* and in the context of the facts of record.

*Ramirez v. Smart Corp.*, 371 Ill. App. 3d at 801, citing *Courson v. Danville School District No. 118*, 301 Ill. App. 3d 752 (1998). Therefore, we examine the facts contained within the record to determine whether the trial court's decision to grant summary judgment on behalf of the City can be upheld.

## Municipal Tort Immunity

■ Plaintiff claims that the trial court erred by granting summary judgment on behalf of the City pursuant to section 3—102 of the Act. Section 3—102(a) of the Act provides as follows:

> "Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." 745 ILCS 10/3—102(a) (West 2006).

First, the trial court found the City owned the fence that decedent struck. Next, the court merged the concepts of personal and real property by stating:

> "Even if there was no ownership, the fence *and location* of the Bryant Steinbach accident was CITY 'property' because the CITY exercised dominion and control *over both* the fence and the location of the accident." (Emphasis added.)

■ However, the definition of the term "property" under the Act is restrictive and does not apply to all possessory interests. In fact, the Act specifically defines public property as "real or personal property *owned or leased* by a local public entity." (Emphasis added.) 745 ILCS 10/3—101 (West 2006). We must apply this statutory definition to the trial court's findings for purposes of summary judgment.

## Personal Property

■ In its motion for summary judgment and memorandum in support, the City stated that the "fence," consisting of the posts and cable, was City property. Further, the City also filed answers to request to admit facts, admitting that the City erected the posts and cable set forth above in the section entitled "City's Answers to Interrogatories and Requests to Admit Facts." Plaintiff's sixth amended complaint alleged the posts and cable were erected by the City. Finally, the City's counsel argued this point to the trial court at the hearing on the mo-

tion for summary judgment. Accordingly, we agree that the posts and cable belonged to the City. The court's conclusion was founded soundly on the statutory definition of "public" property and the undisputed facts in this case.

## Real Property

Finding that the City "exercised dominion and control *over both* the fence and the location of the accident" (emphasis added), the judge also concluded the location of the accident occurred on City property. This finding was central to the court's ultimate determination that Bryant Steinbach was trespassing at the time of the accident for purposes of summary judgment.

Ultimately, the trial court's decision to allow summary judgment was premised on a finding that the City was immune from liability because the decedent was neither intended nor permitted by the City to use the gravel roadway. Next, we examine whether the facts were undisputed on the material issue of whether the location of the accident qualified as City property according to the definition of "property" under the Act.

The language of the easement in favor of the City appears in the record on appeal. The purpose of the easement, granted to the City, was "for a 34.5KVA wireline, and no other purpose." The easement allowed the City access to the land to construct, replace, repair, maintain and operate the wireline. Similarly, the easement language included a mandate that "Grantor shall permit Grantee reasonable right of entry" for the purpose of constructing, replacing, repairing, maintaining and operating the 34.5KVA wireline. The legal description of the easement describes the easement as "non-exclusive," and the easement grant specifies that "Grantor" therein shall be modified as "appropriate to confer rights of 'Grantor' on CSX Transportation Company and International Mining Company."

As a premise to its ruling, the trial court observed the accident took place within the railroad's right-of-way. The trial court's finding that the location of the accident occurred on the railroad right-of-way was supported by the undisputed facts in this case. However, the court incorrectly concluded that "because the CITY exercised dominion and control *over both* the fence and the location of the accident," the location of the accident was City "property." (Emphasis added.)

The court then stated:

> "There cannot be any dispute in this particular case that Bryant Steinbach was not an intended or permitted user. He was a trespasser. He was driving a dirt bike down a *railroad right-of-way* where the City had an easement, where the City had put up this fence. He was not an intended or permitted user. This was not a

dirt bike path. This was not some permitted use." (Emphasis added.)

We disagree with the trial court's finding that "there cannot be any dispute that Bryant Steinbach was *** a trespasser."

The City's limited access to the gravel road was created by an easement the City acquired from Hawkeye Land Company.[2] The City did not own the land and did not lease the gravel road from the railroad. The limited easement granted to the City did not create an exclusive, possessory ownership right to the land allowing the City the unilateral ability to exclude decedent as a permitted user of the gravel road or to prevent the railroad or another grantor from permitting decedent to use the gravel path.

The case law establishes that an easement is described as "a liberty, privilege or advantage without profit which one landowner has over another." *Coomer v. Chicago & North Western Transportation Co.*, 91 Ill. App. 3d 17, 22-23 (1980). However, an "easement is a non-possessory interest in land." *Great Atlantic & Pacific Tea Co. v. La Salle National Bank*, 77 Ill. App. 3d 478, 482 (1979).

We reject the City's contention that the definition of public property according to section 3—101 of the Act (745 ILCS 10/3—101 (West 2006)) includes *any* interest which the public entity owner possesses. The construction of the statute as urged by the City expands the definition of "public property" beyond an ownership or leasehold interest to include non-exclusive easements which are not possessory interests in the land. This construction advanced by the City overlooks the restricted definition of "public property" selected by our lawmakers for purposes of the Act and urges us to, in essence, legislate a broader definition of the term property from the bench. We decline to so do.

■ *For purposes of summary judgment*, the court could not properly consider the decedent to be a trespasser as a matter of law unless it was undisputed that both the railroad, *as well as the* City, denied decedent access to the gravel road. In fact, the record for purposes of summary judgment is silent regarding whether the railroad, which had superior interests in the land compared to the City's easement, prohibited decedent's use of the gravel road.

---

[2]Hawkeye Land Company does not own the property in question. A set of railroad tracks originally existed on the gravel road but has since been removed by CSX. CSX obtained the railroad right-of-way from the previous owners, Chicago Pacific Corporation, but Hawkeye Land Company acquired the right to convey easements on the property from Chicago Pacific Corporation. Hawkeye Land Company conveyed an easement to the City pursuant to its right to grant easements on the land at issue.

Here, the evidence indicated that CSX employees knew of individuals using the service road for recreational purposes, and CSX did not take action to prohibit or prevent the activities. It was undisputed that the railroad, CSX, did not erect the barricade that the decedent struck. In fact, the railroad normally restricted access to its right-of-ways by using earthen barriers, large rocks, or illuminated signs, according to the deposition of Patrick Benoir, roadmaster for CSX. Thus, we conclude the trial court erroneously determined that, undisputedly, decedent was a trespasser on the real property controlled and owned by CSX, in spite of the unclear record regarding whether CSX, or another grantor, allowed or permitted dirt bike traffic on the gravel road.

The City had a limited right or privilege to use the gravel road for reasonable access to construct, maintain, operate, and repair the City's 34.5 KVA wireline. This privilege of reasonable access did not create a sufficient, possessory interest in the land such that the City could singularly designate decedent's status as a trespasser or claim the status of the location on the gravel road as public property. 745 ILCS 10/3—101, 3—102(a) (West 2006). Therefore, we conclude the court erroneously granted summary judgment based on immunity arising from the location of the accident upon the railroad right-of-way that the City did not own, lease, or exclusively control.

We note the language of the easement and the placement of the cable "fence" create an intriguing legal interface between the City's privilege of reasonable access to the railroad's right-of-way and the propriety of the City's decision to place a cable barrier across the railroad's unrestricted right-of-way. In spite of the parties' invitation to do so, we will not address the issue of whether the City exceeded the scope of its easement because the City does not deny ownership of the posts, cable and attached yellow sleeve, regardless of whether the easement was exceeded or honored and that this issue is not dispositive of the outcome of this appeal. Accordingly, we conclude the trial court erroneously found the provisions of section 3—102(a) of the Act (745 ILCS 10/3—102(a) (West 2006)) shielded the City as a matter of law based on the location of the accident.

In light of our decision regarding the lack of the City's possessory interest in the land, the immunity set forth in section 3—109 does not apply because the Act defines a hazardous recreational activity as a recreational activity "conducted on property of a local public entity." 745 ILCS 10/3—109(a), (b) (West 2006). Consequently, the relationship of both sections of the Act need not be addressed for purposes of this appeal.

We reiterate that our decision is based upon the limited issue presented to this court on appeal concerning the trial court's decision to grant summary judgment in favor of the City based on the location of the accident and decedent's status as a trespasser at that location. In light of the disputed material facts regarding whether other entities with superior possessory interests to the City may have intended or permitted decedent to travel on the gravel path at the time of the accident, we conclude the trial court could not properly grant summary judgment based on this record. Accordingly, the trial court's grant of summary judgment in favor of the City is reversed.

## CONCLUSION

The judgment of the circuit court of LaSalle County is reversed and remanded for further proceedings.

Reversed and remanded.

McDADE and SCHMIDT, JJ., concur.