# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Choice v. YMCA of McHenry County, 2012 IL App (1st) 102877**

---

| | |
|---|---|
| Appellate Court Caption | VIRGINIA CHOICE, as Special Administrator of the Estate of Melvin Choice III, Deceased; LEONARD AVANT, as Special Administrator of the Estate of Jimmy Avant, Deceased; and BRIGETTE JONES, as Special Administrator of the Estate of Adrian Jones, Deceased, Plaintiffs-Appellants, v. YMCA of McHENRY COUNTY, an Illinois Corporation, Defendant-Appellant (North Lawndale College Preparatory Charter High School, an Illinois Corporation, and the Board of Education of the City of Chicago, Defendants-Appellees). |
| District & No. | First District, Fifth Division<br>Docket Nos. 1-10-2877, 1-10-2878, 1-10-2897 cons. |
| Filed | August 17, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Section 310 of the Tort Immunity Act immunized defendant school and board of education from liability for the drowning deaths of three students who sneaked away from a leadership camp for a late-night excursion on paddleboats, since plaintiffs failed to establish that section 310 violated the equal protection, special legislation or certain remedy clause and there was a strong argument that plaintiffs failed to allege willful and wanton misconduct by defendants. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 08-L-12929, 09-L-245, 09-L-8513 cons.; the Hon. Clare E. McWilliams, Judge, presiding. |

| Judgment | Affirmed. |
|---|---|

| Counsel on Appeal | Timothy J. Young, Leena Soni, and Michael L. Shacter, all of Lewis Brisbois Bisgaard & Smith, LLP, of Chicago, for appellant YMCA of McHenry County. |
|---|---|
| | Thomas E. Pakenas, of Dale & Pakenas, of Chicago, for appellant Virginia Choice. |
| | David E. Rapoport and Joshua L. Weisberg, both of Rapoport Law Offices, P.C., and Matthew Willens, of Willens Law Offices, P.C., both of Chicago, for appellant Leonard Avant. |
| | Melvin Brooks, of Cochran, Cherry, Givens, Smith & Montgomery, LLC, of Chicago, for appellant Brigette Jones. |
| | Joseph P. Postel, David S. Osborne, and James L. Wideikis, all of Reppaport & Postel, LLC, and Lauren K. Meacham and Patrick J. Norris, both of Meachum & Starck, both of Chicago, for appellees. |

| Panel | PRESIDING JUSTICE EPSTEIN delivered the judgment of the court, with opinion. |
|---|---|
| | Justices McBride and Quinn concurred in the judgment and opinion.* |

## OPINION

¶ 1     This case arises from the drowning deaths of three high school students on the Fox River. In November 2008, students from North Lawndale College Preparatory Charter High School (Lawndale High School) were attending a one-week school ethical leadership program at Camp Algonquin, a camp operated and maintained by the YMCA of McHenry County (YMCA). In the early morning hours of November 14, 2008, 16 students surreptitiously left the dormitory to ride paddleboats on the nearby Fox River. As a result of this late-night boating excursion, three of the students, 17-year-old Melvin Choice III, Jimmy Avant, and

---

     *Justice Joseph Gordon originally authored this opinion. Following Justice Gordon's passing, Presiding Justice Epstein adopted the opinion. Justice Quinn has reviewed the briefs and oral argument recordings.

Adrian Jones,[1] drowned.

¶ 2    The estates of the three students who drowned (collectively, the Choice plaintiffs) brought a wrongful death suit against Lawndale High School, the Board of Education of the City of Chicago (Board) (collectively referred to as the school defendants), YMCA, and Visionquest Association, Inc., which allegedly designed and conducted the leadership retreat. In addition, one of the surviving students who witnessed the drownings, Marshaun Williams, brought suit against the school defendants, YMCA, and Visionquest Association for negligent infliction of emotional distress. The Choice plaintiffs' suit and the Williams suit were subsequently consolidated into the instant action.

¶ 3    The school defendants filed combined motions to dismiss the counts pertaining to them pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2008)), claiming that they were fully immunized from liability by section 3-110 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1-101 *et seq.* (West 2008)) (Tort Immunity Act), which provides, "Neither a local public entity nor a public employee is liable for any injury occurring on, in, or adjacent to any waterway, lake, pond, river or stream not owned, supervised, maintained, operated, managed or controlled by the local public entity." 745 ILCS 10/3-110 (West 2008). Plaintiffs, on the other hand, contended that the applicable immunity provision was section 3-109 of the Tort Immunity Act, which provides qualified immunity for local public entities against participants in hazardous recreational activities, but, unlike section 3-110, contains an exception for willful and wanton misconduct. These statutes and their interplay shall be fully discussed in the Analysis section of this decision.

¶ 4    The trial court found that section 3-110 of the Tort Immunity Act fully immunized the school defendants from liability. Accordingly, it granted the school defendants' motions to dismiss the counts against them, leaving the action standing against the remaining defendants. Both the Choice plaintiffs and YMCA filed appeals pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010), which have been consolidated into the appeal at hand.[2] (Visionquest Association did not appeal from the judgment at issue herein and, according to the brief of the school defendants, has been dismissed without prejudice prior to the issuance of this opinion.) For the reasons that follow, we affirm.

¶ 5                                    I. BACKGROUND

¶ 6    The Choice plaintiffs' first consolidated complaint at law alleges the following. On October 15, 2008, YMCA's Camp Algonquin accepted reservations for 31 students from Lawndale High School to attend a one-week ethical leadership program to be held at Camp Algonquin from November 7, 2008, to November 14, 2008. According to the complaint, this program was staffed by employees of each of the defendants, who shared responsibility for the safety and security of the students.

_____

[1]The ages of Avant and Jones are not mentioned in the record.

[2]Plaintiff Williams does not appeal.

¶ 7        Camp Algonquin is located along the western shore of the Fox River. According to the complaint, on October 8, 2008, approximately a month before the program began, Camp Algonquin staff placed seven paddleboats near the shore of the Fox River without chaining or otherwise securing the paddleboats to prevent them from being used without permission. The complaint states that these seven paddleboats were stored without their drain plugs attached. Without drain plugs, the paddleboats would slowly fill with water during ordinary use and become increasingly unstable in a process that would be gradual because of the small size of the drain holes and the fact that the boats contained floatation material. The complaint alleges that the paddleboats remained without drain plugs until the incident that occasioned this lawsuit.

¶ 8        The ethical leadership program took place from November 7, 2008, to November 14, 2008. During that week, the 31 Lawndale High School students were assigned sleeping accommodations in a building known as Ward House, with none of the staff being assigned to stay with them in the same building. This allegedly violated Camp Algonquin's chaperone rule, which required an 8:1 ratio of students to staff, as well as the Board's chaperone rule, which required a 6:1 ratio of students to staff.

¶ 9        According to the complaint, in the early morning hours of November 14, 2008, during their final night at Camp Algonquin, sixteen of the students sneaked out of Ward House at night, helped themselves to the YMCA paddleboats, apparently without permission, and rode them on the Fox River. The complaint alleges that the boat containing one of the plaintiffs, Choice, began to fill with water due to the missing drain plugs, and, as a result, Choice "was caused to enter the water." The other two plaintiffs, Avant and Jones, allegedly dove into the water to save Choice, resulting in the drowning of all three of them.

¶ 10       The complaint further alleges that four days prior to this occurrence, on the night of November 10, 2008, four of the students sneaked out of the Ward House at approximately 11 p.m. They took one of the paddleboats and rode it briefly in the Fox River, not realizing that the drain plugs were missing or that the boat was taking on water. When they finished, they pulled the paddleboat partially onto the west shore of the Fox River, where they left it for the night before returning to Ward House. By the next morning, the paddleboat had gotten loose and floated across to the opposite shore of the river, where it allegedly remained in plain view until November 14, 2008. The complaint alleges that most, if not all, of the students knew about the paddleboat on the far shore of the river. The complaint further alleges that staff of each of the defendants should have known that there was a paddleboat on the far shore and why it was there.

¶ 11       The Choice plaintiffs filed a complaint in 25 counts seeking damages for wrongful death and for conscious pain and suffering. Counts I through VI assert claims of negligence against YMCA, alleging that YMCA negligently failed to reinstall the drain plugs on the paddleboats, negligently placed the paddleboats without drain plugs in an area that camp employees knew or should have known would be frequented by children, and negligently failed to warn of the condition of the paddleboats. Plaintiffs further allege that YMCA negligently allowed 31 high school students, including the three Choice plaintiffs, to stay at Ward House without an appropriate amount of chaperones.

¶ 12    Counts VII through XII allege willful and wanton conduct by YMCA, predicated upon the same allegations of negligence made in counts I through VI.

¶ 13    Counts XIII through XVIII assert claims for "Willful and Wanton Conduct" against the school defendants. In these counts, plaintiffs allege that the school defendants had a duty to properly supervise and maintain discipline of the high school students attending the ethical leadership program. Plaintiffs further allege that, in violation of this duty, the school defendants:

"a. Willfully, wantonly and in violation of Board of Education of the City of Chicago rules, allowed 31 high school students including Jimmy Avant, Melvin Choice III and Adrian Jones to stay in The Ward House dorm at YMCA Camp Algonquin without an appropriate number of qualified chaperones staying with them from November 7, 2008 to November 14, 2008;

b. Willfully and wantonly failed to adequately supervise the high school students attending the ethical leadership program at YMCA Camp Algonquin from November 7, 2008 to November 14, 2008;

c. Willfully and wantonly failed to adequately discipline the high school students attending the ethical leadership program at YMCA Camp Algonquin from November 7, 2008 to November 14, 2008."

Counts XIX through XXIV[3] assert claims of negligence against Visionquest Association. However, since Visionquest Association is not a party to the instant appeal and was subsequently dismissed from the case, we need not discuss these counts.

¶ 14    Finally, in count XXV, the Choice plaintiffs seek a declaratory judgment that, with regard to the instant case, section 3-110 of the Tort Immunity Act, which provides absolute immunity to local public entities, is superseded in its application by section 3-109, which, unlike section 3-110, does not shield local public entities from liability for willful and wanton conduct. Alternately, they seek a declaration that section 3-110 is unconstitutional.

¶ 15    As noted, plaintiff Williams, one of the surviving students, filed a separate complaint seeking relief for the emotional distress that he suffered as a result of the November 14, 2008, incident. His first amended complaint, which frames the issues with respect to him, largely tracks the allegations of the Choice plaintiffs' complaint and seeks relief in 10 counts. Counts I and II, respectively, seek damages for unspecified negligence and damages for negligent infliction of emotional distress against Visionquest Association. Counts III, IV, and V, respectively, assert negligence, negligent infliction of emotional distress, and willful and wanton conduct against the Board. In count III, the negligence count, Williams contends that the Board negligently

"a. Failed to adequately secure the paddleboats;

b. Failed to make safe the use of the paddleboats;

---

[3]Counts XXII through XXV appear to have been misnumbered in the complaint. To facilitate our referencing them in this decision, we have corrected this problem by ordinally numbering each of these counts in their proper sequence.

c. Failed to supply an adequate number of chaperones;

d. Failed to require that co-defendants supply an adequate number of chaperones;

e. Failed to adequately train its employees in proper supervision; and

f. Failed to adequately supervise MARSHAUN WILLIAMS and other students."

Williams repeats these allegations in count IV and again in count V, except that in count V, he states that the Board "Knowingly and with conscious disregard" failed to perform each action.

¶ 16 Counts VI, VII, and VIII of Williams' complaint, respectively, assert negligence, negligent infliction of emotional distress, and willful and wanton conduct against Lawndale High School, and they echo the allegations of his claims against the Board. Finally, counts IX and X of Williams' complaint, respectively, seek damages for unspecified negligence and damages for negligent infliction of emotional distress against YMCA, and they echo the allegations of the parallel claims against the Board.

¶ 17 The school defendants filed combined motions to dismiss the counts pertaining to them pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure, claiming that they were immunized from liability by section 3-110 of the Tort Immunity Act. In the alternative, they contended that, even if such immunity did not apply, the plaintiffs had failed to state a cause of action for willful and wanton misconduct, and they had also failed to allege facts that would establish proximate cause.

¶ 18 The trial court granted the school defendants' motions to dismiss under section 2-619 of the Code of Civil Procedure, finding that section 3-110 of the Tort Immunity Act applied and provided them with unqualified immunity under the facts of the case. In doing so, the court rejected the plaintiffs' argument that the school defendants "supervised" the Fox River within the meaning of section 3-110 so as to be excluded from the immunity provisions of section 3-110. Instead, it found that the Fox River was supervised and controlled by the Fox Waterway Agency pursuant to the Fox Waterway Agency Act (615 ILCS 90/1.1 *et seq.* (West 1998)). The trial court also rejected plaintiffs' challenge to the constitutionality of section 3-110 of the Tort Immunity Act. Thus, the trial court entered orders dismissing all claims against the school defendants.

¶ 19 The Choice plaintiffs and YMCA now appeal. Although plaintiff Williams did not join in this appeal, the dismissal of the school defendants from his action is included in the appeal brought by the YMCA.

¶ 20 II. ANALYSIS

¶ 21 The first issue under contention by the parties is the scope of the school defendants' immunity from suit under the Tort Immunity Act. In this regard, appellants argue that, under the facts of this case, the applicable section of the Tort Immunity Act is section 3-109, which would leave the school defendants open to liability for willful and wanton misconduct, instead of section 3-110, which provides blanket immunity for those defendants that fall within its protection. Alternatively, appellants argue that we should interpret section 3-110 as containing an immunity exception for willful and wanton conduct, notwithstanding the

-6-

fact that no such exception is contained in the text of that section. Lastly, appellants contend that, in the event that we find that section 3-110 is the applicable immunity statute and that the school defendants qualify for immunity under that section, such an interpretation of section 3-110 would render it unconstitutional as applied.

¶ 22    In addition to contesting each of appellants' contentions, the school defendants further contend that, even if we were to agree with appellants that section 3-109 is the applicable immunity statute, such that the school defendants would be subject to liability for willful and wanton misconduct, the school defendants are still entitled to be dismissed from this action for two reasons. First, the school defendants argue that plaintiffs failed to sufficiently allege willful and wanton misconduct in their complaint. Second, they argue that plaintiffs have failed to allege proximate cause as a matter of law.

¶ 23                    A. Determining the Applicable Immunity Statute

¶ 24    We begin by considering whether section 3-109 or section 3-110 governs the scope of the school defendants' immunity in the instant case. We note at the outset that none of the parties urges the application of any other section of the Tort Immunity Act.

¶ 25    Section 3-110, which the trial court applied in the instant case, provides: "Neither a local public entity nor a public employee is liable for any injury occurring on, in, or adjacent to any waterway, lake, pond, river or stream not owned, supervised, maintained, operated, managed or controlled by the local public entity." 745 ILCS 10/3-110 (West 2008). By contrast, section 3-109, which appellants urge is the correct statute to apply in the instant case, provides limited immunity for local public entities for damages sustained by plaintiffs participating in "hazardous recreational activities":

> "(a) Neither a local public entity nor a public employee is liable to any person who participates in a hazardous recreational activity, including any person who assists the participant, or to any spectator who knew or reasonably should have known that the hazardous recreational activity created a substantial risk of injury to himself or herself and was voluntarily in the place of risk, or having the ability to do so failed to leave, for any damage or injury to property or persons arising out of that hazardous recreational activity.[4]

> (b) As used in this Section, 'hazardous recreational activity' means a recreational activity conducted on property of a local public entity which creates a substantial (as distinguished from a minor, trivial, or insignificant) risk of injury to a participant or a spectator.

> 'Hazardous recreational activity' also means:

> (1) Water contact activities, except diving, in places where or at a time when lifeguards are not provided and reasonable warning thereof has been given or the injured party should reasonably have known that there was no lifeguard provided at

_____

[4]Appellants do not challenge the school defendants' status as local public entities for purposes of the Tort Immunity Act.

the time.

\* \* \*

(c) Notwithstanding the provisions of subsection (a), this Section does not limit liability which would otherwise exist for any of the following:

\*\*\*

(2) An act of willful and wanton conduct by a public entity or a public employee which is a proximate cause of the injury." 745 ILCS 10/3-109 (West 2008).

¶ 26 The school defendants contend that section 3-109, by its terms, does not apply to the instant case, because paddleboating does not constitute a "hazardous recreational activity" and because the paddleboating incident was not "conducted on property of a local public entity" as required under section 3-109(b). Appellants, on the other hand, contend that section 3-110 does not apply to the instant case because its protection only extends to riparian entities, located adjacent to a body of water, and not to landlocked entities. Additionally, appellants argue that even if the provisions of section 3-110 applied under these facts, the school defendants would not be immune from suit, since section 3-110 only confers immunity where the body of water at issue is "not owned, supervised, maintained, operated, managed or controlled by the local public entity." 745 ILCS 10/3-110 (West 2008). In that respect, appellants contend that the school defendants supervise the Fox River within the meaning of that provision.

¶ 27 We consider these contentions in turn. In doing so, we are mindful that in all statutory construction, our primary task is to ascertain and effectuate the intent of the legislature. *People v. Pullen*, 192 Ill. 2d 36, 42 (2000). In doing so, we must assume that the legislature did not intend to create an absurd or unjust result. *Id.* However, we are also mindful that the language of the statute is the surest and most reliable indicator of legislative intent, and where that language is clear and unambiguous, we must apply that language without further aids of statutory construction. *People v. Zaremba*, 158 Ill. 2d 36, 40 (1994); see *Village of Carpentersville v. Pollution Control Board*, 135 Ill. 2d 463, 469-70 (1990) (declining to consider legislative history where language of statute was unambiguous).

¶ 28                       1. Whether Section 3-109 Applies

¶ 29 We begin by considering the applicability of section 3-109 to the instant case. The school defendants' first contention in this regard is that paddleboating does not constitute a "hazardous recreational activity" because it neither "creates a substantial (as distinguished from a minor, trivial, or insignificant) risk of injury to a participant or a spectator" (745 ILCS 10/3-109(b) (West 2008)) nor qualifies as a "[w]ater contact activit[y]" under subsection (b)(1) (745 ILCS 10/3-109(b)(1) (West 2008)). Appellants argue that paddleboating is, in fact, a water contact activity, citing *Burdinie v. Village of Glendale Heights*, 139 Ill. 2d 501, 514 (1990), *overruled in part on other grounds by McCuen v. Peoria Park District*, 163 Ill.

2d 125 (1994)[5], where our supreme court stated, without qualification, that " 'Water contact activities' include swimming, *boating*, and water skiing." (Emphasis added.)

¶ 30    The school defendants nevertheless argue that "[w]ater contact activities" should only encompass activities in which it is foreseeable that the participant will become entirely immersed in water and therefore vulnerable to waterborne pathogens. They further argue that paddleboating is not such an activity, since "the user sits above the water line and immersion is not contemplated or reasonably foreseeable." However, we note that a similar argument could be made with respect to the majority of boating activities, in that the participant is intended to remain on the boat and there is little, if any, contact with the water, let alone full bodily immersion, yet our supreme court in *Burdinie* nevertheless found boating to constitute a water contact activity within the meaning of section 3-109. Although the *Burdinie* court's statement with regard to boating was *dictum*, in that *Burdinie* was a case involving swimming rather than boating, we nevertheless must be guided by it. *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993) ("[e]ven *obiter dictum* of a court of last resort can be tantamount to a decision and therefore binding in the absence of a contrary decision of that court").

¶ 31    The school defendants next contend that this section does not apply to the instant case because the paddleboating excursion was not "conducted on property of a local public entity" as stated in section 3-109(b), which defines hazardous recreational activities. Appellants, on the other hand, contend that since subsection (1) is prefaced by the word "also," the definition of hazardous recreational activities in that subsection is alternative to the definition contained in the main section of section 3-109(b) and, as such, does not require the activity to have been conducted on public property, as required under the portion of section 3-109(b) immediately preceding subsection (1).

¶ 32    However, the text of section 3-109(b) does not require that we construe the word "also" as providing an alternative to every requirement contained in the opening paragraph of section 3-109(b), including the requirement that the activity at issue be conducted on property of a local public entity. Rather, more convincingly, the term "also" would simply expand the type of activities which are considered to be hazardous without setting aside the overall requirement that all such activities would have to be conducted on property of a local public entity in order to trigger the immunity granted by section 3-109. This interpretation would be the more cogent one in determining the intent of the legislature. To adopt the appellants' interpretation that the activities listed after the word "also" would not be subject to the requirement that they be conducted on property of a local public entity, as stated in the opening paragraph of section 3-109(b), would appear to be wholly arbitrary. Appellants make no attempt to explain why the legislature would choose to require an activity described generically as one that "creates a substantial (as distinguished from a minor, trivial, or insignificant) risk of injury to a participant or a spectator" to be conducted on property of a

[5]*Burdinie* dealt with several immunity sections of the Tort Immunity Act, including both section 3-109 and section 3-106, the latter of which is not at issue in the present case. *Burdinie*, 139 Ill. 2d at 513-14. In *McCuen*, a section 3-106 case, our supreme court overruled *Burdinie* with respect to its section 3-106 analysis only. *McCuen*, 163 Ill. 2d at 130. Thus, *McCuen* does not purport to disturb the viability of *Burdinie*'s section 3-109 analysis as applied to the present case.

local public entity, while imposing no such parallel requirement for the specifically enumerated hazardous recreational activities listed in the remainder of section 3-109(b). Nor do we see any rationale for drawing such a distinction. See *Pullen*, 192 Ill. 2d at 42 (in interpreting a statute, we must assume that the legislature did not intend to create an absurd result). In addition, appellants do not provide any cases that have followed their interpretation of the statute in this regard.

¶ 33    It is of interest that in the case of *Steinbach v. CSX Transportation, Inc.*, 393 Ill. App. 3d 490 (2009), which involved a claim of immunity under section 3-109, the court did not even contemplate any such distinction as appellants are now urging. In that case, the father of a deceased dirt biker brought a wrongful death action against the city to recover for the dirt biker's death when he struck a steel cable that was stretched across a gravel roadway. *Id.* at 491. The *Steinbach* court rejected the city's claim that it was immune from liability under section 3-109, finding that the city did not have a possessory interest in the land at issue and the incident was therefore not "conducted on property of a local public entity" as required under section 3-109(b) (745 ILCS 10/3-109(b) (West 2008)). *Steinbach*, 393 Ill. App. 3d at 520. In doing so, the court did not discuss whether the decedent's dirt biking "create[d] a substantial *** risk of injury to a participant or a spectator," as described in the opening paragraph of section 3-109(b) (745 ILCS 10/3-109(b) (West 2008)), or whether it fell under one of the enumerated categories of activities following the word "also." Rather, the court appeared to globally apply the requirement of being "conducted on property of a local public entity" regardless of any such distinction. (Internal quotation marks omitted.) *Steinbach*, 393 Ill. App. 3d at 520; see 745 ILCS 10/3-109(b)(3) (West 2008) (enumerating "off-road motorcycling" as a *per se* hazardous recreational activity).

¶ 34    Thus, we reject appellants' contention that the immunity conferred by section 3-109 would apply in the instant case, even where the activity at issue was not conducted on property of a local public entity, simply because that activity is an enumerated activity listed under subsection (1) and is preceded by the word "also."

¶ 35    We note that appellants do not challenge the trial court's conclusion that the Fox River was not the property of a local public entity beyond making a cursory one-sentence statement, without any elaboration or further discussion, that the trial court failed to provide any support or explanation for such a conclusion. Conversely, appellants do not present any authority or citation to the record that would support a finding that the trial court's conclusion was in error, nor do they attempt to explain what ramifications would follow from such conclusion on the part of the trial court. Accordingly, appellants have waived this point. Ill. S. Ct. R. 314(h)(7) (eff. July 1, 2008) (appellants' brief shall contain citation of authority and the pages of the record relied upon).

¶ 36    In any event, even if the activities enumerated under section 3-109(b) would not have required that they occur on the property of the school defendants, or even if the property at issue met the requirement of being property of a local public entity, the paddleboat excursion that led to the Choice plaintiffs' deaths was not "conducted" by the school defendants within the meaning of section 3-109(b), since it was not in any way done at the direction of the school defendants. See *Grandalski v. Lyons Township High School District 204*, 305 Ill. App. 3d 1, 11-12 (1999). In *Grandalski*, the court determined that a student who performed

a gymnastics maneuver known as a "flip-flop" during a gymnastics class was not engaging in activity "conducted" by the local public entity within the meaning of section 3-109, because the maneuver was not performed at the teacher's direction but was spontaneously performed by the student. *Id*. Likewise, in the present case, the students spontaneously sneaked out of Ward House in the early hours of November 14, 2008, and the records provide no basis for the conclusion that this surreptitious activity was sanctioned, let alone conducted, by the school defendants.

¶ 37    Accordingly, we find that, because the paddleboat incident was not "conducted on property of a local public entity" as required under section 3-109(b), that section does not apply to the instant case.

¶ 38                    2. Whether Section 3-110 Protects Nonriparian Entities

¶ 39    We now turn to consider the applicability of section 3-110 to the instant case. Appellants contend that section 3-110 only affords protection from suit to riparian[6] public entities and not to landlocked public entities. Both the Board and Lawndale High School are based in Chicago. Thus, appellants argue, they are both "landlocked" and ineligible to claim immunity under section 3-110.

¶ 40    As noted, section 3-110 provides, in its entirety: "Neither a local public entity nor a public employee is liable for any injury occurring on, in, or adjacent to any waterway, lake, pond, river or stream not owned, supervised, maintained, operated, managed or controlled by the local public entity." 745 ILCS 10/3-110 (West 2008). The plain language of this statute does not purport to draw any distinction based on the geographic location of the entity but, rather, on the location of the injury "on, in, or adjacent to" a waterway. On the face of the statute, there is nothing that requires any proximity between the entity and the waterway at issue. Rather than limiting its scope based upon the geographic relationship between the entity and the waterway at issue, its application is premised upon the site of the occurrence and the proprietary interest and degree of control maintained by the entity over that site. Thus, contrary to appellants' contention, it would appear that the legislature did not intend to deny landlocked public entities the protection afforded by section 3-110. See *Zaremba*, 158 Ill. 2d at 40 (language of the statute is the surest and most reliable indicator of legislative intent).

¶ 41    Appellants nevertheless contend that this court has previously restricted the application of section 3-110 to municipalities located near waterways, citing *McCoy v. Illinois International Port District*, 334 Ill. App. 3d 462, 471 (2002). We disagree. *McCoy* is primarily focused on the issue of special legislation, which is invoked by applying the immunity provisions under section 3-110 and with which we deal later on in considerable detail. The required location of the public entity under section 3-110 is only incidental to the discussion of that issue. To the extent that *McCoy* would purport to require the public entity

---

[6]Black's Law Dictionary defines "riparian" as "Of, relating to, or located on the bank of a river or stream (or occasionally another body of water, such as a lake)." Black's Law Dictionary 1328 (7th ed. 1999).

itself to be located adjacent to a waterway, it would be unacceptable, since it would contravene the plain language of that section. As discussed, the language of that section addresses only the location of the injury and not the location of the protected entity. Moreover, as shall be more fully discussed later on, that interpretation, even if otherwise tenable under the plain language of the statute, which it is not, would be wholly unnecessary to preserve its constitutionality.

¶ 42    The school defendants raise the alternative argument that, even if section 3-110 were only to apply to riparian entities, they would still qualify for its protection, because they are not landlocked but are located in a municipality which contains the Chicago River, Lake Michigan, and "numerous other substantial waterways." Although there is cogency to this argument, we need not reach it in light of our holding that, under the plain language of the statute, section 3-110 may be applied to local public entities that would otherwise incur liability for accidents occurring on, in, or adjacent to bodies of water, without regard to their status as landlocked or riparian.

¶ 43                3. Whether the School Defendants "Supervised" the Fox River

¶ 44    Appellants next contend that, even if section 3-110 is controlling, and even if the immunity conferred by that section may be claimed by landlocked entities, the school defendants are still not immune from suit under that section because of the supervisory authority that appellants claim they exercised over the Fox River under the facts of this case. As noted, section 3-110 provides: "Neither a local public entity nor a public employee is liable for any injury occurring on, in, or adjacent to any waterway, lake, pond, river or stream not owned, *supervised*, maintained, operated, managed or controlled by the local public entity." (Emphasis added.) 745 ILCS 10/3-110 (West 2008). Thus, if the school defendants did, in fact, supervise the Fox River, they would not be shielded from liability under this section.

¶ 45    The school defendants contend that the Fox River is supervised not by them, but by the Fox Waterway Agency, pursuant to the Fox Waterway Agency Act (615 ILCS 90/1 *et seq*. (West 2008)). Indeed, section 7.1 of the Fox Waterway Agency Act provides:

"The Agency shall implement reasonable programs and adopt necessary and reasonable ordinances and rules to improve and maintain the Chain O Lakes–Fox River recreational waterway from the Wisconsin State line to the Algonquin Dam for the purposes of boating *** and other recreational uses, *** and to create and administer a procedure for establishing restricted areas." 615 ILCS 90/7.1 (West 2008).

See generally *County of Lake v. Fox Waterway Agency*, 326 Ill. App. 3d 100, 105-06 (2001) (citing this provision in discussing the powers and duties of the Fox Waterway Agency).

¶ 46    Appellants do not argue that the Fox Waterway Agency lacks supervisory authority over the Fox River, but they argue that such supervisory authority need not be exclusive and, in this case, the school defendants also had supervisory authority in that they had "the right and obligation to deny their students access to the Fox River." The school defendants, on the other hand, argue that supervising students, even at a program located near a river, is not tantamount to supervising the river itself. We agree with the school defendants.

-12-

¶ 47    In this regard, we find *Frayne v. Dacor Corp.*, 362 Ill. App. 3d 575 (2005), to be instructive. When plaintiff's decedent, a firefighter, drowned in a multi-agency scuba dive training exercise, plaintiff brought suit against the fire protection districts involved in that training exercise. *Id.* at 576. At issue was whether the districts were protected from liability by section 3-110 of the Tort Immunity Act. *Id.* at 577. The *Frayne* plaintiff, like the plaintiffs in the instant case, argued that the districts "supervised" the lake where the dive occurred within the meaning of section 3-110. *Id.* at 580. The evidence showed that the districts supervised the dive and, in fact, exercised control over nearly every aspect of the dive. *Id.* at 578, 581. However, the districts did not own the lake. *Id.* at 577. Rather, the lake was owned by a local club that agreed to permit the districts to use the lake for the dive training exercise. *Id.*

¶ 48    Under these facts, the *Frayne* court agreed with the trial court's conclusion that the districts did not supervise the lake for purposes of section 3-110, since "although the defendants may have controlled and supervised the dive, they did not control or supervise the lake." *Id.* at 581. The court explained:

> "[T]here is no evidence suggesting that defendants could exert any minimal control over the lake. As the trial court noted, the firefighters were nothing more than guests. The uncontradicted deposition of Ritz makes it clear that defendants had no right to grant or deny anyone access to the lake or any portion of it." *Id.*

In particular, the court cited testimony that, even while the dive was ongoing, the districts lacked authority to prevent club members from using the lake. *Id.*

¶ 49    Thus, under *Frayne*, supervision requires a right to control access to the body of water at issue, not merely derived from the public entity's right to control the behavior of a small group of individuals under its command, but a general right derived from a proprietary or similar interest in the situs of the body of water itself. That is why the fire districts' control over the firefighters was insufficient to constitute supervision over the lake itself. Similarly, in the present case, although plaintiffs have alleged that the school defendants had the right and the obligation to supervise the students, plaintiffs have not alleged that the school defendants had any general supervisory authority over the Fox River, such that they could grant or deny access to third parties who might wish to use the river. Consequently, pursuant to the standard articulated in *Frayne*, the school defendants did not supervise the Fox River for purposes of section 3-110.

¶ 50                    B. Whether Section 3-110 Contains an Exception
                            for Willful and Wanton Misconduct

¶ 51    Appellants next contend that, even if we find that section 3-110 is the applicable immunity statute in the instant case, we should find that section to contain an immunity exception for willful and wanton misconduct, notwithstanding the fact that no such exception for willful and wanton misconduct is stated in the text of that section. In support, appellants raise two arguments. First, they argue that, under *Kobylanski v. Chicago Board of Education*, 63 Ill. 2d 165 (1976), it is "well established" that educators may be held liable for willful and wanton misconduct. Second, they argue that a 1998 amendment to section 3-108 of the Tort Immunity Act, which provides partial immunity for conduct concerning supervision of an

activity, demonstrates that "the legislature intended a willful and wanton standard to apply universally to educators' liability for supervising students."

¶ 52    We disagree with appellants. Our supreme court has consistently rejected attempts to inject willful and wanton immunity exceptions into statutes that, on their face, do not contain them. Rather, our supreme court has stated that when the legislature intends to except willful and wanton misconduct from the provisions of an immunity statute, it has " ' "unambiguously done so." ' " *DeSmet v. County of Rock Island*, 219 Ill. 2d 497, 514 (2006) (quoting *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 491 (2001), quoting *Barnett v. Zion Park District*, 171 Ill. 2d 378, 391 (1996)); see also *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 196 (1997) (where the legislature omitted an immunity exception for willful and wanton conduct from the plain language of section 2-201 of the Tort Immunity Act, the legislature must have intended to immunize liability for both negligence and willful and wanton misconduct).

¶ 53    Thus, for instance, in *DeSmet*, 219 Ill. 2d at 514-15, the court held that because the plain language of the immunity provision in section 4-102 of the Tort Immunity Act, dealing with police protection services, contained no exception for willful and wanton conduct, the legislature intended to immunize local public entities and public employees from liability for both negligence and willful and wanton conduct. The court explained: "Section 4-102 of the Act is comprehensive in the breadth of its reach ***. Moreover, section 4-102 contains no exception for willful and wanton misconduct. We hold, given the facts of this case, that section 4-102 immunizes defendants against both negligence and willful and wanton misconduct." *Id.* at 515. Similarly, our supreme court held in the 1996 case of *Barnett*, 171 Ill. 2d at 391-92, that since the plain language of section 3-108 did not, at that time, contain an immunity exception for willful and wanton misconduct, the legislature must have intended to grant immunity for such misconduct.

¶ 54    Nor does *Kobylanski*, 63 Ill. 2d at 173, require a contrary result. As noted above, appellants cite that case for the proposition that educators may be held liable for willful and wanton conduct. However, *Kobylanski* is inapposite, because it does not purport to define the scope of immunity granted to local public entities under section 3-110 of the Tort Immunity Act but, rather, deals with immunity under the School Code (now see 105 ILCS 5/1-1 (West 2008)). *Kobylanski*, 63 Ill. 2d at 170. Indeed, the *Kobylanski* court explicitly finds that the Tort Immunity Act is inapplicable to the factual situations presented in that case. *Id.* at 174. Accordingly, *Kobylanski* is not controlling with respect to the scope of immunity provided by section 3-110.

¶ 55    Appellants next argue that the 1998 amendment to section 3-108 of the Tort Immunity Act demonstrates that the legislature intended for a willful and wanton standard to apply in all cases involving educators' liability for supervising students. Prior to the 1998 amendment, section 3-108, which confers immunity for injuries sustained during the course of an activity on public property which a public entity undertook to supervise, granted absolute immunity to public entities. See *Barnett*, 171 Ill. 2d at 391. In 1998, the legislature amended section 3-108 to contain an immunity exception for willful and wanton misconduct. 745 ILCS 10/3-108 (West 2008). Although appellants do not contend in their appellate brief that section 3-108 applies to the instant case, they assert that the immunity standard articulated in section

-14-

3-108–namely, liability for willful and wanton conduct–should also be applied to cases falling under section 3-110.

¶ 56　　However, appellants point to no case where exclusion of willful and wanton conduct from an immunity statute was implied from another statute rather than explicitly stated, and they provide no basis upon which such an inference would be predicated. Moreover, the tenuousness of this argument is explicitly addressed in *Ries v. City of Chicago*, 242 Ill. 2d 205 (2011), where our supreme court rejected a nearly identical argument. The *Ries* plaintiffs brought suit against the city of Chicago after they were injured when a stolen police vehicle struck their vehicle. *Id.* at 207. The *Ries* court initially had to determine the applicable immunity statute under the Tort Immunity Act. *Id.* Plaintiffs urged the court to apply section 2-202 (745 ILCS 10/2-202 (West 2008)), which deals with the execution or enforcement of law and which contains an immunity exception for willful and wanton misconduct, while the city urged the court to apply section 4-106(b), which deals with injuries inflicted by escaping prisoners and, on its face, contains no such immunity exception. *Ries*, 242 Ill. 2d at 220. The *Ries* court found that section 4-106(b) applied under the facts of that case. *Id.* Plaintiffs then argued that section 2-202's immunity exception for willful and wanton misconduct should be applied to narrow the scope of the city's immunity under section 4-106(b). *Id.* at 221. Our supreme court disagreed, citing *DeSmet* for its "unambiguous declaration of the principle that exceptions for willful and wanton misconduct may not be read into Tort Immunity provisions that do not contain them." *Id.* at 225 (citing *DeSmet*, 219 Ill. 2d at 514-15); see also *Chicago Flood Litigation*, 176 Ill. 2d at 196 (where the legislature omits an exception for willful and wanton misconduct from the text of an immunity statute, it must have intended to immunize liability for such misconduct). Likewise, under *Ries*, *DeSmet*, and *Chicago Flood Litigation*, we must reject appellants' argument that section 3-108's immunity exception for willful and wanton misconduct should be applied to narrow the scope of the school defendants' immunity under section 3-110, since the plain language of section 3-110 contains no such exception.

¶ 57　　　　　　　　　　C. Constitutionality of Section 3-110

¶ 58　　Appellants finally contend that section 3-110 is unconstitutional as applied to the facts of the instant case. In this regard, as shall be fully developed below, appellants argue that, in the case at bar, application of section 3-110 violates the equal protection and special legislation clauses of the Illinois Constitution, as well as the certain remedy clause of the Illinois Constitution. Ill. Const. 1970, art. I, §§ 2, 12; art. IV, § 13.

¶ 59　　In assessing these claims, we recognize that our supreme court has frequently emphasized that all legislative enactments carry a strong presumption of constitutionality. *Bernier v. Burris*, 113 Ill. 2d 219, 227 (1986). Accordingly, we must construe a statute in a manner upholding its constitutionality if reasonably possible, and we must resolve any interpretative doubt in favor of the statute's validity. *People v. Boeckmann*, 238 Ill. 2d 1, 6-7 (2010); *Harris v. Manor Healthcare Corp.*, 111 Ill. 2d 350, 368 (1986). Moreover, the party raising a constitutional challenge bears the burden of clearly establishing a constitutional violation. *Boeckmann*, 238 Ill. 2d at 6-7; *Barnes v. Chicago Housing Authority*, 326 Ill. App. 3d 710,

729 (2001) (stressing the "heavy burden" borne by a party challenging the constitutionality of a statute).

¶ 60    We begin by considering appellants' contention that application of section 3-110 in this case violates the equal protection and special legislation clauses. Since the analysis under both of these clauses is identical (*Bilyk v. Chicago Transit Authority*, 125 Ill. 2d 230, 236 (1988); *People ex rel. Skinner v. Hellmuth, Obata & Kassabaum, Inc.*, 114 Ill. 2d 252, 259 (1986)), we consider these claims together. See *Gavery v. County of Lake*, 160 Ill. App. 3d 761, 765 (1987). Appellants urge that section 3-110 violates the equal protection and special legislation clauses under the facts of the present case because it "denied recovery of damages based on the fortuitous location of where the decedents' deaths occurred." They argue that if, hypothetically, 16 high school students sneaked out of Ward House in the middle of the night to ride paddleboats in a YMCA swimming pool, and, as a result, some of them drowned in that swimming pool, those hypothetical plaintiffs would be in a superior position to the plaintiffs in the instant case because the school defendants would not be able to claim immunity under section 3-110. Appellants further argue that such distinction is entirely arbitrary and therefore unconstitutional.

¶ 61    The equal protection clause provides that "No person shall be *** denied the equal protection of the laws." Ill. Const. 1970, art. I, § 2. Under this section, the state is required to treat similarly situated persons in a similar manner. *People v. Kimbrough*, 163 Ill. 2d 231, 237 (1994). Although the State retains the power to classify persons and treat different classes of persons differently, it may not exercise this power arbitrarily. *Id.*; *People v. Reed*, 148 Ill. 2d 1, 7 (1992). In particular, it may not arbitrarily differentiate between similarly situated people by placing them in nominally different classes. *Reed*, 148 Ill. 2d at 7 (citing *Eisenstadt v. Baird*, 405 U.S. 438, 447 (1972)).

¶ 62    This prohibition on arbitrary discrimination against persons or classes is supplemented by the special legislation clause in our state constitution, which provides, "The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination." Ill. Const. 1970, art. IV, § 13. Our supreme court has explained that this clause "prohibits the General Assembly from conferring a special benefit or exclusive privilege on a person or class to the exclusion of others similarly situated. In short, it prohibits legislation which arbitrarily discriminates in favor of a select group." *Bilyk*, 125 Ill. 2d at 236.

¶ 63    Where, as here, a statute does not affect a fundamental right or involve a suspect or quasi-suspect classification, the determination as to whether it violates the equal protection and special legislation clauses is conducted under the rational basis test, under which the statutory classification will be upheld if it is rationally related to a legitimate State interest. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 393 (1997); see *People v. Shephard*, 152 Ill. 2d 489, 500-01 (1992) (for purposes of equal protection analysis, a fundamental right is one that is guaranteed by the federal or state constitution); *People v. Hagen*, 191 Ill. App. 3d 265, 267 (1989) (suspect classes include race, religion, and alienage). Our supreme court has explained review under the rational basis test as follows:

"A statute will be held unconstitutional as special legislation and as violative of the equal protection guarantee only if it was enacted for reasons totally unrelated to the pursuit of a legitimate State goal. [Citation.] The legislature has broad latitude and discretion in drawing statutory classifications to benefit the general welfare, and the classifications it makes are presumed to be valid. A legislative classification will be upheld if any set of facts can be reasonably conceived which justify distinguishing the class to which the law applies from the class to which the statute is inapplicable." *Bilyk*, 125 Ill. 2d at 236 (citing *People v. Coleman*, 111 Ill. 2d 87 (1986)).

It is difficult for a party challenging the constitutionality of an immunity statute to meet this burden, as shown by the numerous instances in which the Tort Immunity Act and similar immunity statutes have withstood challenges under the equal protection and special legislation clauses. See, *e.g.*, *Davis v. Chicago Housing Authority*, 136 Ill. 2d 296, 301-02 (1990); *Bilyk*, 125 Ill. 2d at 236 (rejecting plaintiff's claim that Tort Immunity Act violated equal protection and special legislation clauses).

¶ 64    In this case, we disagree with appellants' contention that distinguishing between a swimming pool and a river is not rationally related to a legitimate state interest. It would not be unreasonable for the legislature to find that waterways, such as the Fox River, present a significantly greater threat in terms of potential liability for public entities than swimming pools, because of such factors as greater total area, greater potential distance from shore, greater depth, and greater unpredictability due to such factors as water current. Seeking to reduce such potential liability for public entities is a legitimate state goal, as our supreme court has explained:

"The reason [for tort immunity of local governmental entities] is one of public policy, to protect public funds and public property. Taxes are raised for certain specific governmental purposes; and, if they could be diverted to the payment of the damage claims, the more important work of government, which every municipality must perform regardless of its other relations, would be seriously impaired if not totally destroyed." (Internal quotation marks omitted.) *Davis*, 136 Ill. 2d at 302 (holding that Tort Immunity Act did not violate special legislation and equal protection clauses) (quoting 18 Eugene McQuillin, McQuillin on Municipal Corporations § 53.24 (1963)).

*Cf. Ostergren v. Forest Preserve District*, 104 Ill. 2d 128, 133 (1984) (absolute immunity granted to forest preserve for injuries sustained by plaintiff while snowmobiling was justified in light of the "massive repairs" that might be required for landowners to make their property safe for snowmobiling in the absence of such immunity). Thus, the fact that the school defendants enjoy greater immunity for activities undertaken in the Fox River as opposed to in a YMCA swimming pool is not arbitrary but is related to the pursuit of a legitimate state goal. See *Bilyk*, 125 Ill. 2d at 236.

¶ 65    Appellants acknowledge that it is reasonable for the legislature to seek to protect public entities located near bodies of water from liability for accidents that occur in bodies of water. They apparently contend that the legislature may not constitutionally extend that same protection to landlocked entities, citing *McCoy*, 334 Ill. App. 3d at 471. We disagree. In *McCoy*, the plaintiff, as the administrator of a deceased longshoreman's estate, brought an

-17-

action against the port district, alleging that the port district's negligence in maintaining the dock where the longshoreman was working caused him to fall into the water and drown. *Id.* at 464. The trial court dismissed plaintiff's negligence claim on grounds that the port district was immune from liability under section 3-110. *Id.* at 465. On appeal, plaintiff claimed that section 3-110 was unconstitutional in that it violated the special legislation clause of our state constitution. *Id.* at 470. The *McCoy* court rejects this claim, stating:

> "In order to accept the claim that the statute violates the special legislation clause of the Illinois Constitution, we would have to equate public entities near bodies of water with those that are landlocked. *** Like all legislation, the sections of the Tort Immunity Act were created to address certain persons, groups and situations. In this case, section 3-110 deals with immunity in the context of local public entities near waterways. Our reading of the statute indicates that all municipalities near the water are treated in the same manner." *Id.* at 471.

In this passage, it appears that the *McCoy* court may have conflated the location of the injury with the location of the public entity, since, under the facts of *McCoy*, the location of the injury and the location of the public entity were one and the same. The *McCoy* court does not seem to even contemplate a situation in which the public entity is located somewhere other than near the body of water where the injury occurred, much less purport to announce a rule that, in such a case, a landlocked entity may not enjoy the immunity granted by section 3-110. More overridingly, neither the *McCoy* court nor the appellants in the instant case make any compelling argument as to why, if the legislature may legitimately seek to shield riparian public entities from exposure to liability for accidents on open bodies of water, it may not seek to confer the exact same protection upon landlocked public entities, provided the injury for which they are being sued occurred on a waterway. As indicated earlier, there are legitimate reasons for the legislature to choose to protect public entities from suits occasioned by the dangers inherent in open waterways. Those dangers are not dependent upon the location of the public entity but, rather, the location of the accident in, on, or adjacent to a waterway. Consequently, we reject appellants' argument that section 3-110 as applied in the instant case violates the equal protection and special legislation clauses of our constitution.

¶ 66 We next turn to consider appellants' contention that section 3-110, as applied to the instant case, violates the certain remedy clause of the constitution. That clause provides, "Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly." Ill. Const. 1970, art. I, § 12. However, appellants provide no argument in their brief specifically pertaining to this provision and supporting their contention that it is violated by the application of section 3-110 in this case. Thus, any such contention is waived. Ill. S. Ct. R. 314(h)(7) (eff. July 1, 2008) (points not argued are waived).

¶ 67 In any event, even if we were to reach the merits of appellants' contention, we would find it to be unfounded. Our supreme court has noted that the certain remedy clause is "merely an expression of a philosophy and not a mandate that a 'certain remedy' be provided in any specific form." (Internal quotation marks omitted.) *Cassens Transport Co. v. Illinois*

*Industrial Comm'n*, 218 Ill. 2d 519, 532 (2006); see *Bilyk*, 125 Ill. 2d at 245. Thus, although the certain remedy clause has been held to prohibit the legislature from entirely abolishing a particular category or type of action (*Heck v. Schupp*, 394 Ill. 296, 300 (1946) (holding unconstitutional a statute barring civil actions based on alienation of affection, criminal conversation, and breach of promise to marry)), it is well established that the legislature retains broad discretion to restrict or alter an existing remedy as necessary to promote the general welfare (*Bilyk*, 125 Ill. 2d at 245). For instance, it does not violate the certain remedy clause for the legislature to enact periods of repose within which actions must be brought, even if some individual plaintiffs' actions may be barred before they are discovered (*Mega v. Holy Cross Hospital*, 111 Ill. 2d 416, 424 (1986)), or to restrict the amount or type of damages a party may recover (*Siegall v. Solomon*, 19 Ill. 2d 145, 149 (1960) (upholding constitutionality of statute providing that punitive damages are not recoverable in an action for alienation of affection)), or to restrict the class of potential defendants from whom a plaintiff may seek a remedy (*Ostergren*, 104 Ill. 2d at 133-34 (statute providing that an owner of premises had no duty to keep the premises safe for snowmobilers did not violate the certain remedy clause where "[t]he victim in a snowmobile accident can still sue the manufacturer, distributor or designer of the snowmobile, as well as other drivers, to name only a few of the myriad of possible defendants")).

¶ 68    In keeping with these principles, and, in particular, the principle that the legislature has broad power to restrict the class of potential defendants from whom a plaintiff can seek recovery as long as it does not entirely abolish the plaintiff's cause of action, the Tort Immunity Act has repeatedly withstood constitutional challenges under the certain remedy clause. See *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 519-20 (2000) (upholding constitutionality of Tort Immunity Act against certain remedy clause challenge because "passage of the Tort Immunity Act constituted an exercise by the General Assembly of its broad power to determine whether a statute that restricts or alters an existing remedy is reasonably necessary to promote the general welfare"); *Davis*, 136 Ill. 2d at 301-02 (holding that there was "no substance" to plaintiff's claims that section 3-106 of the Tort Immunity Act was unconstitutional under the certain remedy clause); *Sullivan v. Midlothian Park District*, 51 Ill. 2d 274, 277-78 (1972) (section 3-106 of Tort Immunity Act does not violate certain remedy clause); *cf. Bilyk*, 125 Ill. 2d at 245-47 (provision of Metropolitan Transit Authority Act which provides immunity to Chicago Transit Authority for failure to provide a security or police force did not violate the certain remedy clause because that provision "does not abolish the plaintiff's cause of action for the injuries he suffered; it simply restricts the liability of one category of defendants"). Similarly, in addition to having the purpose of enhancing the " 'protect[ion of] public funds and public property' " (*Davis*, 136 Ill. 2d at 302 (quoting 18 Eugene McQuillin, McQuillin on Municipal Corporations § 53.24 (1963))), the application of section 3-110 of the Tort Immunity Act to the instant case does not purport to abolish plaintiffs' cause of action, since, although the class of potential defendants is restricted, plaintiffs are not precluded from seeking a remedy from third parties, such as the YMCA. See *Ostergren*, 104 Ill. 2d at 133 (certain remedy clause not violated where plaintiff is restricted from suing a particular defendant but retains cause of action against third parties); *Bilyk*, 125 Ill. 2d at 247 (legislature may use immunity statutes

-19-

to restrict the class of potential defendants from whom a plaintiff may recover so long as it does not abolish the cause of action itself). Accordingly, we must reject appellants' contention that section 3-110 of the Tort Immunity Act, as applied, violates the certain remedy clause.

¶ 69                    D. Whether Plaintiffs State a Cause of Action
                              for Willful and Wanton Misconduct

¶ 70    Based on the foregoing analysis, we find that section 3-110 applies to the instant case and provides absolute immunity to the school defendants. However, at this juncture, we note that the school defendants additionally contend that, even if they were not immune from liability for willful and wanton misconduct, dismissal of the complaint was nevertheless proper, because plaintiffs failed to state a cause of action for willful and wanton behavior on the part of the school defendants. We find that, even if willful and wanton misconduct were the relevant standard, either because of the application of section 3-109, which would arguably be the applicable immunity statute if not for its requirement that the activity at issue be conducted on property of a local public entity, or because a willful and wanton standard were to apply under section 3-110, a strong argument could be made that plaintiffs have not adequately stated a cause of action for willful and wanton conduct.

¶ 71    Section 1-210 of the Tort Immunity Act defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210 (West 2008). Our supreme court has explained that willful and wanton conduct involves more than " 'mere inadvertence, incompetence, unskillfulness, or a failure to take precautions.' " *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill. 2d 429, 449 (1992) (quoting Restatement (Second) of Torts § 500 cmt. g (1965)). Rather, it " 'requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.' " *Burke*, 148 Ill. 2d at 449 (quoting Restatement (Second) of Torts § 500 cmt. g (1965)).

¶ 72    Applying this standard to cases involving misconduct by students, Illinois courts have held that a teacher's mere act of leaving students unsupervised, without more, is not sufficient to establish willful and wanton conduct. *Jackson v. Chicago Board of Education*, 192 Ill. App. 3d 1093, 1100 (1989). Rather, a plaintiff must plead and prove that the school "was aware or should have known that the absence of supervision posed a high probability of serious harm or an unreasonable risk of harm." *Id.*; see *Pomrehn v. Crete-Monee High School District*, 101 Ill. App. 3d 331, 335 (1981) ("It is essential that plaintiff allege and establish that when the defendant acted, or failed to act, he had knowledge, or should have had the knowledge under the circumstances, that his conduct posed a high probability of serious physical harm to others."). Where such knowledge is lacking, Illinois courts have consistently held that willful and wanton misconduct is not present. See *Knapp v. Hill*, 276 Ill. App. 3d 376, 385 (1995); *Jackson*, 192 Ill. App. 3d at 1101; *Pomrehn*, 101 Ill. App. 3d at 335-36; *Mancha v. Field Museum of Natural History*, 5 Ill. App. 3d 699 (1972). The mere

fact that teenagers, being teenagers, may comport themselves in such a manner as to expose themselves or others to injury is legally insufficient to support a claim of willful and wanton misconduct in the absence of a specific, foreseeable, and probable danger.

¶ 73    Such was the court's holding in *Pomrehn*, 101 Ill. App. 3d at 335. The *Pomrehn* plaintiff, a member of her high school softball team, was injured in an automobile-related accident prior to the team's daily softball practice. *Id.* at 333. Practice was scheduled to begin at 5:50 p.m., and the incident in question occurred at 5:45 p.m., at a time when the softball coach had not yet arrived at the practice field. *Id.* The reason for the coach's absence was that, on that day, the school principal had specifically required the coach to remain at the school until 5:45 p.m. *Id.* Plaintiff brought suit against the school district, alleging that the principal knew or should have known that his action increased the risk of injury at softball practice, since the girls arrived at the practice field beginning around 5:30 p.m. *Id.* at 333-34. Nevertheless, the *Pomrehn* court found that summary judgment was proper against plaintiff on the issue of willful and wanton misconduct, since she failed to present any evidence that the school acted in reckless or conscious disregard of known dangers. *Id.* at 335. The court explained:

> "There was no evidence of any special dangers presented during the time between the end of classes and the beginning of softball practice. There was no evidence of prior problems or hazards with the softball team members, or the practice area involved herein. Certainly, there is a risk of injury and a danger involved in almost any gathering of teenagers. Yet this general potential for danger with groups of children is not sufficient to support a charge of willful and wanton misconduct. [Citation.] No foreseeable, probable danger flowing from a lack of supervision between 5:30 p.m. and 5:45 p.m. was shown to have existed." *Id.*

¶ 74    Similarly, in *Jackson*, 192 Ill. App. 3d at 1095, the court rejected plaintiff's claim that a failure to supervise students constituted willful and wanton misconduct. The *Jackson* plaintiff alleged that, while she was in a classroom for 12- to 15-year-old mentally handicapped students, the teacher left the classroom unsupervised, and during this time she was struck by a chalkboard clip thrown by another student. *Id.* She brought a personal injury suit against the teacher, the teacher's aide, and the Board. *Id.* The *Jackson* court held that her averments were insufficient to establish willful and wanton conduct where there was no evidence that the school had any knowledge of prior behavioral problems of the student who threw the clip. *Id.* at 1101; see also *Mancha*, 5 Ill. App. 3d at 703 (during school field trip to museum, 12-year-old student was allowed to tour without supervision and was attacked and beaten by third parties; court held that school district could not be held liable for willful and wanton misconduct, since "[a]llowing the plaintiff to tour the Field Museum without supervision was an intentional act, but it was not an act which the defendant teachers knew–or should have known–would result in harm to the plaintiff or create an unreasonable risk of harm").

¶ 75    Moreover, mere speculation as to potential harm, or conclusory allegations as to knowledge of potential harm, are also insufficient to sustain a cause of action for willful and wanton misconduct. *Knapp*, 276 Ill. App. 3d at 385. In *Knapp*, the plaintiff's decedent, Robert, as well as his classmates Michael and Charles, were classmates in an automotive repair class. *Id.* at 378. At the end of class, when Charles drove his car from the class area

to return it to the school parking lot, Robert hid in the back of Charles' car. *Id.* After reaching the parking lot, Robert began to walk back to the classroom. *Id.* On his way there, he encountered Michael returning his car to the parking lot and jumped on the hood of Michael's car. *Id.* Michael accelerated and then braked suddenly, causing Robert to be thrown from the hood and sustain injuries leading to his death. *Id.* at 378-79. Robert's estate brought suit against, among other parties, the school district, claiming that the school district had committed willful and wanton misconduct in failing to prevent such horseplay. *Id.* at 379.

¶ 76    The *Knapp* court rejected this claim. *Id.* at 385. In doing so, it observed that plaintiff merely made a conclusory allegation that the school district knew or should have known that students had previously been injured or that there was a substantial risk of injury during the removal of automobiles from the shop area. *Id.* However, plaintiff failed to allege what these previous injuries were, when they occurred, or how the school district could properly be charged with knowledge of them. *Id.* Thus, the *Knapp* court found that plaintiff's allegation in this regard was "a mere conclusion premised upon unfounded speculation" and was insufficient to constitute an allegation of willful and wanton misconduct on the part of the school district. *Id.*

¶ 77    By contrast to *Pomrehn*, *Jackson*, *Mancha*, and *Knapp*, in the cases where Illinois courts have found a triable issue of material fact with respect to willful and wanton misconduct premised upon a lack of proper supervision, it has been because plaintiffs have alleged that defendants knew or should have known of a specific, foreseeable, and probable danger arising from their lack of supervision. For instance, in *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 217 (2007), a 13-year-old student was injured in a mini-trampoline accident during a tumbling class sponsored and taught by defendants. The *Murray* court held that a triable issue of material fact existed on whether defendants' conduct was willful and wanton. *Id.* at 246. It explained that there was specific evidence, not only that the supervision in the tumbling class was inadequate, but that defendants knew or should have known that such inadequate supervision posed substantial risks to students:

    "The evidence demonstrates that it is well known that use of a mini-trampoline is associated with the risk of spinal cord injury from improperly executed somersaults and that catastrophic injuries, including quadriplegia, can result from an improperly executed somersault. The evidence also indicates that the tumbling/trampoline program was not supervised by an instructor with professional preparation in teaching trampolining, nor was it taught in a proper manner with reminders of the risk of injury incorporated into the teaching process. The evidence also indicated that trained spotters and safety equipment were not provided at all times, and none of the United States Gymnastic Federation Safety Manual guidelines were followed." *Id.*

¶ 78    In reaching its decision, the *Murray* court relied in part upon *Doe v. Chicago Board of Education*, 213 Ill. 2d 19 (2004), the facts of which are also instructive. In *Doe*, plaintiff's ward, a mentally impaired special education student, was allegedly sexually assaulted by a fellow student while riding the school bus, and plaintiff brought suit against the Board. *Id.* at 22. Plaintiff alleged that the attendant employed to supervise the children on the school bus had called in sick, thus leaving the children unsupervised. *Id.* Plaintiff further alleged that

the assailant had a deviant sexual history, had been declared a sexually aggressive child and youth ward, and was under a " 'Protective Plan' " requiring that he not be left unsupervised with other children. *Id.* The *Doe* court held that these averments of fact were sufficient to present a jury question as to whether the Board committed willful and wanton misconduct in leaving the children unsupervised. *Id.* at 29.

¶ 79 Arguably, plaintiffs in the instant case have not alleged any such foreknowledge of specific and probable harm as was present in *Murray* or in *Doe*. It is true that plaintiffs have alleged that the school defendants knew or should have known that, on November 10, 2008, several students sneaked out of Ward House and rode a paddleboat on the Fox River. However, plaintiffs have failed to allege facts from which it could be concluded that the school defendants knew or should have known that harm was likely to result from any such late-night excursion. See *Mancha*, 5 Ill. App. 3d at 703 (no willful and wanton misconduct where teachers intentionally allowed student to tour museum unsupervised but it was not an act that teachers knew or should have known would create an unreasonable harm). In this regard, the instant case would be distinguishable from *Murray* and *Doe*, both of which involved activities that were patently dangerous on their face, respectively, trampolining, about which it is "well known" that "catastrophic injuries, including quadriplegia," may result from improperly executed maneuvers (*Murray*, 224 Ill. 2d at 246), and leaving plaintiff unsupervised with a student who had a deviant sexual history and who had been declared sexually aggressive (*Doe*, 213 Ill. 2d at 22). By contrast, there is no such obvious danger associated with paddleboating. Plaintiffs have not alleged that the school defendants had any knowledge of the dangerous condition of the boats, namely, the removal of drain plugs, that led to the injury in the instant case. Rather, the complaint states that these paddleboats were the property of YMCA. Plaintiffs do not claim that the school defendants owned the boats, were responsible for their maintenance in any way, or otherwise had any basis upon which we could infer that they knew or should have known of their dangerous condition.

¶ 80 In the absence of any such knowledge by the school defendants, any claim that the school defendants should have known of the danger these paddleboats posed to their students is mere speculation. See *Knapp*, 276 Ill. App. 3d at 385 (plaintiff's claim that school district should have known that there was a substantial risk of injury during the removal of automobiles from the shop area was "a mere conclusion premised upon unfounded speculation" where plaintiff failed to allege any specific incidents of past injuries or how the school district could properly be charged with any knowledge of them). Thus, a strong argument could be made that plaintiffs have failed to allege that the school defendants acted in reckless disregard of a "foreseeable, probable danger flowing from a lack of supervision" during the night of November 14, 2008, as would be necessary to sustain a claim for willful and wanton misconduct. *Pomrehn*, 101 Ill. App. 3d at 335; see *Mancha*, 5 Ill. App. 3d at 703.

¶ 81 Since we have already found the school defendants' immunity in this case to be controlled by section 3-110, which confers absolute immunity from suit, and we have additionally found that, even if the school defendants were not immune from liability for willful and wanton misconduct, a strong argument could be made that plaintiffs have failed to allege such misconduct, we need not address the school defendants' final argument, namely, that the actions of the students in sneaking out of the dormitory and the actions of

the YMCA in failing to have drain plugs in their paddleboats constitute superseding causes absolving the school defendants of liability.

¶ 82                                III. CONCLUSION

¶ 83      For the foregoing reasons, the judgment of the trial court in dismissing all counts against the school defendants is affirmed.

¶ 84      Affirmed.